**Arnold RITTER, D.O., Appellant,**

v.

**Walter COHEN, Individually and in his official capacity as Secretary of the Department of Public Welfare, Commonwealth of Pennsylvania and Gerald Radke, Individually and in his official capacity as Deputy Secretary of the Department of Public Welfare, Commonwealth of Pennsylvania, Appellees.**

**Nos. 85–1691, 86–1302.**

United States Court of Appeals, Third Circuit.

Argued June 5, 1986.

Decided July 23, 1986.

Gilbert B. Abramson, Philip L. Blackman, Michael B. Tolcott (argued), Abramson, Cogan, Kogan, Freedman, and Blackman, P.C., Philadelphia, Pa., for appellant.

LeRoy S. Zimmerman, Atty. Gen., Joel M. Ressler (argued), Deputy Atty. Gen., John G. Knorr, III, Senior Deputy Atty. Gen., Andrew S. Gordon, Chief Deputy Atty. Gen., Chief, Litigation Section, Harrisburg, Pa., for appellees.

Before ADAMS, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This case requires us to consider what process the state of Pennsylvania is constitutionally required to furnish when terminating a medical provider's participation in the Medicaid program. The district court rejected an osteopathic physician's due process claim, declaring that he lacked a property interest in his continued role in the program, and that even if he was entitled to constitutional protection, he received all of the process that was due. Because we agree that the provider received all of the process that was due, we will affirm.

### I.

Medicaid is a joint federal-state program that makes available medical care for poor people. In Pennsylvania, Medicaid is operated as the Medical Assistance Program (MAP), and administered by the State Department of Public Welfare (DPW) pursuant to 62 Pa.Stat.Ann. § 401 *et seq.* (Purdon's Supp.1986). Under the program, the state contracts with individual providers and institutions to perform services for eligible recipients.

Appellant Arnold Ritter is a licensed osteopathic physician in Pennsylvania. Since 1982, he has served as a MAP provider under a standard agreement with the DPW. Ritter's practice is heavily dependent on MAP-reimbursed patients; he estimates that 99% of his patients are MAP recipients.

In 1984, a peer review committee examined Ritter's medical records, and concluded that he had been providing medically unnecessary treatment for patients suffering from obesity, and that the drugs he prescribed were potentially dangerous. The committee also found that Ritter had billed DPW for methods of treatment that were "inappropriate to the diagnosis," and that he had failed to maintain adequate records.

Gerald Radke, deputy secretary of DPW for medical assistance, sent a letter dated January 18, 1985 to Ritter, informing him

that on the basis of the review committee's findings, the agency planned to terminate his provider agreement within thirty days and to preclude his reenrollment in the program for at least five years. The letter also stated that DPW would seek restitution for the improperly prescribed treatment. The letter offered Ritter the opportunity to respond within thirty days "by documents and written argument against [the Department's proposed] action."

On February 1, Ritter's counsel submitted a four-page letter defending his medical practices and disputing the charges of the peer review committee. The Deputy Secretary, however, was not persuaded. On April 15, he informed Ritter that the Department, upon consideration of his letter, had nonetheless determined that termination was warranted. Ritter was barred as a provider effective April 30. Under DPW regulations, Ritter was further advised, he could file for an administrative hearing with the Office of Hearings and Appeals. The request for a hearing, however, would not stay the termination date, although if his appeal was successful, Ritter would be eligible for reimbursement for any services performed after the date of termination.

Ritter then petitioned for an administrative hearing in accordance with DPW regulations. He also filed suit under 42 U.S.C. § 1983 (1982) in the district court, contending that his termination from the MAP without a prior hearing violated his right to procedural due process. The suit sought damages for the alleged violation, as well as injunctive relief prohibiting the defendants from terminating his provider agreement until the state's procedures were brought into compliance with constitutional standards.

The defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6), asserting that the facts averred in the complaint did not establish a constitutional violation. On October 7, 1985 the district court granted the motion to dismiss, and declined to allow leave to amend. Noting that under Pennsylvania law public employees generally are employed at will, and thus may be dismissed without cause, the court concluded that a MAP provider similarly had no property interest in his continued participation in the program.

On October 17, Ritter filed a motion for leave to submit an amended complaint, to which he attached a proposed amendment setting forth the state law basis for his asserted property interest in his status as a provider. The district court denied the motion for leave to amend on April 17, 1986, on the ground that even if Ritter did enjoy a property interest in his status as a provider, thus invoking the protection of the due process clause, the state had provided him with all of the process due. Ritter filed a timely appeal.[1]

## II.

### A.

The legal principles governing analysis of a procedural due process claim such as Ritter's have been set forth on numerous occasions by the Supreme Court. The Fourteenth Amendment prohibits deprivations of "life, liberty, or property" without due process of law. Thus, to invoke the protections of the clause, a plaintiff must show a deprivation of an "interest [that] is within the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

---

1. On November 6, 1985, Ritter also filed a notice of appeal from the district court's first order of October 7, 1985 dismissing the suit. Because his motion for leave to amend was apparently intended to reopen the judgment pursuant to Fed.R.Civ.P. 59(e), this Court would appear not to have had jurisdiction over the first appeal. Under Fed.R.App.P. 4(a)(4), a notice of appeal filed before the disposition of a Rule 59 motion has no effect. *See, e.g., Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 59, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1983). However, following the district court's denial of the motion for leave to amend, Ritter filed a second appeal, over which we plainly have jurisdiction. With the assent of both parties, we consolidated the two appeals.

Initially, the district court concluded that Ritter had no property interest in his status as a provider. It appeared to ground this conclusion on the fact that under Pennsylvania law public employees have no property interest in their jobs. *See Rosenthal v. Rizzo,* 555 F.2d 390, 392 (3d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977). This approach, however, misconceives the appropriate analysis of a claim such as Ritter's.

It is true that the due process clause itself does not create property interests and that in determining whether a property interest exists, a court must look to "rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. In Ritter's situation the pertinent "rules or understandings" are not those concerning the status of Pennsylvania's public employees, which the district court considered, but rather the state law provisions dealing with MAP providers.

The provider agreement itself does not expressly create an entitlement on the part of the provider not to have the agreement terminated without cause. In fact, it states that "[t]his agreement may be terminated by either party upon thirty (30) days written notice to the other party." App. at 176. However, regulations issued by the DPW state that the Department may terminate a provider's enrollment and participation in the MAP and seek restitution "if it determines that a provider" has engaged in any of twelve specified practices. 55 Pa.Admin.Code § 1101.77(a). In notifying Ritter of the charges against him, DPW relied on § 1101.77(a)(10), which allows termination where a provider has "[r]endered or ordered services or items which the Department's medical professionals have determined to be harmful to the recipient, of inferior quality or medically unnecessary."

Defendants, however, point to § 1101.-77(b), which carries the heading "Departmental termination of the provider's enrollment and participation." Section 1101.-77(b)(1) states that the "Department may terminate the enrollment and direct and indirect participation of, and suspend payments to, any provider upon 30 days advance notice for the convenience or best interest of the Department." Under this regulation, they contend, officials administering the medical assistance program enjoy unlimited discretion to terminate agreements with providers.

Although the regulations are not unambiguous, it may be that § 1101.77(b) is most fairly interpreted as elaborating on the mechanics of implementing § 1107.77(a), and that subsection (b)(1) is designed to prescribe the amount of notice that must be afforded a provider dismissed for one of the permissible grounds in § 1107.77(a). Under this view, a provider could be dismissed only for cause, and thus would have a property interest. We also note that a property interest may be created not only by explicit contractual provisions, but by the "words and conduct" of the parties. *See Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). Thus, it appears Ritter, at the least, would have been entitled to try to prove that the DPW's conduct, together with the regulations, created a reasonable understanding that he would not be terminated without cause. Accordingly, we are inclined to doubt whether it can be said as a matter of law, as would be required for dismissal on the pleadings, that Ritter had no property interest in his status as a provider.

We do not decide this issue, however, for even assuming that Ritter enjoyed a property interest in his status as a provider, and that the due process clause was therefore implicated by his termination, we agree with the district court's subsequent ruling that the plaintiff received all of the process he was due.

### B.

The due process clause itself does not specify the procedures required prior to the deprivation of a protected interest. Under the Supreme Court's decision in *Mathews v.*

*Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), courts are to consider three factors in determining whether the procedures provided by the government comply with due process. They include (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of the interest through the procedure employed, and the probable value of additional procedural safeguards, such as a hearing, and (3) the government's interest, including the fiscal and administrative burdens additional process would create. *Id.,* 424 U.S. at 335, 96 S.Ct. at 903.

With respect to certain property interests, the Supreme Court has already engaged in the prescribed balancing. Thus, it is clear that before a full-time tenured public employee may be discharged, a state must provide the worker with notice and a hearing. *See, e.g., Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985); *Stana v. School District of City of Pittsburgh,* 775 F.2d 122 (3d Cir.1985). While an opportunity to present written reasons arguing against discharge suffices as a form of hearing for such an employee, *see Loudermill,* 105 S.Ct. at 1495, a welfare recipient is entitled to an evidentiary hearing prior to termination, because of the potentially drastic nature of the deprivation, *see, e.g., Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). A Social Security recipient, by contrast, is not entitled to an evidentiary hearing prior to the cutoff of benefits. *See, e.g., Mathews,* 424 U.S. at 349, 96 S.Ct. at 909.

This Court applied the *Mathews* balancing test in a case closely analogous to the one at hand in *Town Court Nursing Center v. Beal,* 586 F.2d 266 (3d Cir.1978) (in banc). There we considered the process due a Pennsylvania nursing home operator prior to being barred from participation in both the state administered Medicaid and the federal Medicare program. We held that the operator was not entitled to a pretermination evidentiary hearing.

■ *Town Court* noted that the consequences of terminating a private nursing home operator from participating in the program were less severe than the cutoff of benefits in *Mathews.* "Town Court is a corporation claiming financial hardship; Eldridge was a private individual claiming physical disability." *Id.* at 268. Ritter points out that ninety-nine percent of his medical practice consists of patients eligible for Medicaid reimbursement. Like the nursing home operator in *Town Court,* however, he is not totally dependent on the program, for he may seek private patients. Moreover, he may continue to treat Medicaid patients and, if he prevails in his appeal, will be eligible for reimbursement from the DPW. In sum, the private interest here does not merit as great a protection as, for example, in *Goldberg.*

Further, we do not believe that the additional protections against erroneous deprivations that an evidentiary hearing may provide would be especially great here. Issues such as the medical necessity of particular treatments, or the adequacy of a physician's records, are not determined to any great extent on credibility grounds. The DPW's decision to terminate is "based in most cases upon routine, standard, unbiased reports by health care professionals." *Town Court,* 586 F.2d at 268. Ritter had an opportunity to meet with the peer review team, and, most important, to submit written reasons why he should not be terminated from the program. Presentation of his case would not be significantly abetted by an evidentiary hearing.

Finally, just as in *Town Court,* "the public interest in preserving scarce financial and administrative resources is strong." *Id.* at 278. Requiring full-blown evidentiary hearings would impose significant monetary costs; the public also has a separate interest in ensuring that its money is not spent on medically unnecessary services.

Thus, application of the test established in *Mathews* suggests that Ritter has received all the process required by the Constitution prior to the cutoff of his provider agreement. This conclusion is bolstered by

the Supreme Court's decision in *Louder-mill*. Dealing there with the procedure owed to a full-time employee facing a more severe deprivation than suffered by Ritter, the Court made clear that while some form of pretermination hearing is required, it "need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 105 S.Ct. at 1496. Here, the pretermination procedures afforded Ritter met these criteria. And, as with the state procedure in *Loudermill*, Pennsylvania offers Ritter a full post-termination hearing.

### C.

■ Ritter also maintains that the state's procedural scheme abridges his due process rights because of the delay in holding the post-termination hearing. In his complaint, he averred that the DPW would not hold a hearing until September 1985, and would not decide his appeal "until sometime in late 1986 at the earliest." We agree that this contention merits consideration, since "the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures." *Loudermill*, 106 S.Ct. at 1495 n. 12. However, we conclude, this allegation alone does not make out a due process violation.

The due process clause "requires provision of a hearing 'at a meaningful time.'" *Loudermill*, 105 S.Ct. at 1495 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). But no fixed rule governs the time in which a post-termination appeal must be decided. In *Loudermill*, the Supreme Court rejected the claim that a nine-month delay in adjudicating the employee's appeal contravened due process. Declaring that a delay of that magnitude was not unconstitutional *per se*, Justice White stated that "Loudermill offers no indication that his wait was unreasonably prolonged other than the fact that it took nine months." *Id. See also Math-*

*ews*, 424 U.S. at 342, 96 S.Ct. at 906 (eleven month delay in adjudicating post-termination appeal of denial of diability benefits does not violate due process, where disability recipient may seek other sources of support).

Similarly, Ritter relies solely on an assertion of how long the proceedings will take. Although the theoretical length of delay in this case exceeds that in *Loudermill* or *Mathews*, we do not believe, under the circumstances here, that the sequence posited by the plaintiff is sufficient by itself to assert a claim under the due process clause. *See Givens v. United States Railroad Retirement Board*, 720 F.2d 196, 201 (D.C.Cir.1983) (nineteen-month delay in adjudicating appeal of denial of railroad benefits does not violate due process, where plaintiff offers no evidence of intentional delay) *cert. denied,* —— U.S. ——, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984); *Frock v. United States Railroad Retirement Board*, 685 F.2d 1041, 1047 (7th Cir.(1982)) (two-year delay in adjudicating appeal does not violate due process) *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983). *Cf. Kelly v. Railroad Retirement Board*, 625 F.2d 486 (3d Cir.1980) (period of three years and nine months to process disability application from initial application through administrative appellate review violates due process).

This would be a different case, of course, if we were dealing with an indigent, or if the plaintiff were not a professional with other potential sources of support. Under such circumstances, a delay of this extent might well state a claim for deprivation of due process. Here, however, the mere allegation of a projected twenty-month delay by an agency, although hardly to be encouraged as a matter of administrative practice, does not state a constitutional violation.

### III.

To summarize, we conclude that even assuming Ritter enjoyed a property interest in his status as a provider in Pennsylvania's MAP, the opportunities for a hearing

and an appeal afforded him by the state meet the requirements of the Constitution. Accordingly, the judgment of the district court will be affirmed.