

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-9-2005

# Hill v. City of Scranton

Precedential or Non-Precedential: Precedential

Docket No. 02-3833

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Hill v. City of Scranton" (2005). *2005 Decisions.* Paper 924.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/924

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos.  02-3833/3988 & 03-1377
_____

PHYLLIS HILL; ROBERT K. MURRAY;
DONALD HICKEY; PAUL W. GRAHAM

v.

CITY OF SCRANTON; JAMES P. CONNORS, Individually
and as mayor, City of Scranton

Phyllis Hill and Paul Graham,

Appellants - No. 02-3833


PHYLLIS HILL; ROBERT K. MURRAY;
DONALD HICKEY; PAUL W. GRAHAM

v.

CITY OF SCRANTON; JAMES P. CONNORS,
Individually and as Mayor, City of Scranton


Phyllis Hill, Donald Hickey
and Paul W. Graham,

Appellants - No. 03-1377

PHYLLIS HILL; ROBERT K. MURRAY;
DONALD HICKEY; PAUL W. GRAHAM

v.

CITY OF SCRANTON; JAMES P. CONNORS, Individually
and as mayor, City of Scranton

Donald Hickey,

Appellant- No.  02-3988

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 01-cv-00744 )
District Judge:  Honorable John E. Jones, III

Argued on September 3, 2003

Before: SLOVITER, NYGAARD and ROTH Circuit Judges

(Opinion filed:  June 9, 2005)

Cynthia L. Pollick, Esquire **(Argued)**
The Employment Law Firm
126 South Main Street, Suite 201
Pittston, PA 18640

Counsel for Appellants

Joseph G. Ferguson, Esquire **(Argued)**
Rosenn, Jenkins & Greenwald
120 Wyoming Avenue
Scranton, PA 18503

Counsel for Appellees

## O P I N I O N

ROTH, <u>Circuit Judge</u>

Since 1980, the city of Scranton, Pennsylvania, has maintained an ordinance requiring city employees to reside within the city. In 1997, a group of twenty-two police officers sought to have the ordinance declared unconstitutional. The U.S. District Court for the Middle District of Pennsylvania dismissed the suit and we affirmed. After an investigation in 2000, the city terminated four of these officers, as well as a police mechanic, who was not a party to the 1997 suit, for failing to comply with the ordinance. The terminated officers brought a new suit, alleging that the city had infringed their First Amendment freedom to petition the government and had violated their right to equal protection of the laws by enforcing the ordinance against them in retaliation for their participation in the 1997 suit. The mechanic also brought suit, alleging that he was terminated in retaliation for complaining about the condition of the Department of Public Works garage. Three of the four officers' cases were consolidated for pre-trial purposes with the mechanic's case. The District Court granted summary judgment in favor of the city on the three officers' claims but allowed the mechanic's claims to proceed to trial.[1]

We conclude that the District Court should not have granted summary judgment on the police officers' retaliation claim. The officers presented enough evidence to raise a dispute of material fact as to whether the city impermissibly targeted the 1997 plaintiffs. First and foremost, the officers presented evidence that other city employees, who were not parties to the 1997 suit, were permitted to keep their jobs

---

[1]   The District Court subsequently granted partial summary judgment in favor of the city in the fourth officer's case but that case is not before us.

3

despite the city's knowledge that they were not city residents. Further, it is undisputed that, prior to the officers' terminations in 2000, no city employee had ever been fired for non-compliance with the residency ordinance.

We further hold that the District Court did not abuse its discretion or otherwise err in denying Officer Hickey leave to amend his complaint to add a due process claim that his post-termination Municipal Service Commission hearing has been unreasonably delayed. We also reject the officers' contention that the District Court improperly and unnecessarily entered a final judgment on January 8, 2003. Finally, we reject without substantive discussion all of the remaining issues raised in these appeals.[2]

## II. Facts and Procedural History

In 1997, a group of twenty-two Scranton police officers filed a complaint alleging that the city's residency ordinance was unconstitutional on its face and as applied. With certain exceptions, the ordinance requires all city employees to maintain a "bona-fide residence" within the corporate limits of Scranton during their time of employment. *See* Scranton, Pa., File of the Council No. 17 § 2 (Feb. 27, 1980).[3] The District Court dismissed the complaint in

---

[2] Thus, we affirm the district court's decision to grant summary judgment on Hickey's claim under the Americans with Disabilities Act. We also hold that the officers waived their claim that the district court improperly dismissed as moot various discovery motions pending at the time the district court rendered summary judgment in favor of the city. The officers' passing reference to this claim in the "Statement of Issues For Review" in their opening brief does not suffice to bring it before this court. *See Kopec v. Tate*, 361 F.3d 772, 775 (3d Cir. 2004) (citations omitted).

[3] The ordinance provides in relevant part:
Section 2. On or after March 1, 1980, any new employee of the City of Scranton who is not a resident of the City of Scranton at

December of 1997. The court rejected the officers' facial due process and equal protection challenges to the ordinance, holding, among other things, that the ordinance was rationally related to one or more legitimate government purposes and that the term "bona-fide residence" is not unconstitutionally vague because it is synonymous with "legal domicile," a well-understood legal concept.[4] The District Court also held that the officers' as-applied and procedural due process challenges were not ripe for adjudication. The officers alleged that, despite the ordinance's general applicability, only police officers had received threats of impending enforcement and requests for documents establishing residency. However, the District Court reasoned that none of these claims were ripe because the city had not yet formally enforced the ordinance against any employee or group of employees, nor had the officers alleged that waivers had been granted in an arbitrary or discretionary manner. We affirmed in an unpublished decision. *Kreischer v. City of Scranton*, No. 98-7439 (3d Cir. June 16, 1999).

In late December 1997, shortly after the District Court dismissed the police officers' challenge, the City Controller

---

> the time of the commencement of employment shall have six (6) months from the time of commencement of employment to acquire a bona-fide residence within the corporate limits of the City. Such residence must be maintained during continuous employment by the city or be a cause for immediate termination of the employment relationship between the City of Scranton and the new employee.

[4] The district court relied heavily on *McCarthy v. Philadelphia Civil Service Commission*, 424 U.S. 645, (1976), *affirming* 339 A.2d 634 (Pa. Commw. Ct. 1975). The Supreme Court in *McCarthy* refused to consider a facial constitutional challenge to a similar residency requirement, concluding that the requirement was not irrational. 424 U.S. at 646-47.

5

issued a memorandum to all city employees requesting documentation and affidavits verifying each employee's residency.[5]  In October 1999, several months after we had affirmed the dismissal, the city and the police union agreed to incorporate the residency ordinance into the new collective bargaining agreement (CBA), which was ratified later that month.  The CBA specified that the term "bona fide residence" means "sole legal residence or domicile."  It also provided for a six-month grace period for all police officers to come into compliance.  While the precise language varied, the residency ordinance was also incorporated into other collective bargaining agreements between the city and other unions representing city employees.

In May 2000, the city hired a private investigation firm to investigate certain employees who were suspected of living outside the city.  The city initially sent a list of eight names to the investigator, seven of whom were police officers who had sued the city in 1997 and one of whom was a firefighter.  Ultimately, between 2000 and 2001, the city investigated about 25 individuals but only terminated five:  Donald Hickey, Phyllis Hill, Paul Graham, Jason Gnall, and Robert Murray.  Hickey, Hill, Graham, and Gnall were police officers involved in the 1997 suit against the city.  All were offered pre-termination hearings with the mayor.  Hickey and Gnall sought post-termination hearings before the Municipal Service Commission of the City of Scranton but as of early 2004 had yet to receive their hearings.

In April 2001, Hickey, Hill, Graham, and Murray brought this suit under 42 U.S.C. § 1983 against the city of Scranton and Mayor James Connors (hereinafter the "city"), alleging among other things that the city selectively enforced the residency ordinance against them in retaliation for

---

[5]    Section 5 of the residency ordinance provides that "[t]he Controller of the City of Scranton may, from time to time, . . . require adequate proof of bona-fide residence within the City of Scranton."  Scranton, Pa., File of Council No. 17, § 5.

exercising their First Amendment rights.[6]  Hickey, Hill, and Graham alleged that the city retaliated against them for suing the city in 1997, while Murray alleged that the city terminated him for complaining about the condition of the Department of Public Works garage.  In July 2001 the District Court consolidated these cases for all pretrial purposes.  In July 2002, the parties filed cross-motions for summary judgment.  In Hickey's brief opposing the city's motion for summary judgment, he argued for the first time that the lengthy delay in his post-termination Municipal Service hearing violated his right to procedural due process.  In September, 2002 the District Court granted summary judgment in favor of the city against Hickey, Hill, and Graham but denied summary judgment with respect to Murray's claims.  The court denied the plaintiffs' motions for summary judgment.  The court treated Hickey's new argument concerning post-termination hearing delay as a constructive motion to amend his complaint and gave the parties additional time to brief the issue whether leave to amend should be granted.  In October 2002, the court denied leave to amend after finding that the amendment would be futile and would be made in bad faith. Hill and Graham appealed the September 2002 order and Hickey appealed both the September and October orders.[7]

In November 2002 the city filed a motion for partial final judgment pursuant to Federal Rule of Civil Procedure 54(b).  The District Court granted this motion over the plaintiffs' opposition, reasoning that a final judgment under Rule 54(b) was necessary to terminate Hickey, Hill, and Graham's claims because the September order was not final as to Murray's claims.  Hill, Hickey, and Graham appealed this decision as well.  We consolidated all of the appeals for purposes of oral argument and resolve all of them in this

---

[6]   Gnall brought a similar suit sometime later, but that case was not consolidated with the others.

[7]   The appellants do not claim that the District Court should have granted their motions for summary judgment, only that it should not have granted summary judgment against them.

opinion.

## II.  Jurisdiction

The District Court had jurisdiction over the plaintiffs' federal claims and pendent state claims under 28 U.S.C. §§ 1331 and 1367, respectively.  We have appellate jurisdiction to review the District Court's final decisions pursuant to 28 U.S.C. § 1291.  As noted, this case involves consolidated appeals.  Because the officers' appeal of the District Court's January 2003 Rule 54(b) order implicates our jurisdiction over the officers' other appeals we consider it in this section.

Federal Rule of Civil Procedure 54(b) provides a mechanism for rendering a partial final judgment as to some, but not all, parties or claims in a single action.[8]  *See Berckeley Inv. Group, Ltd. v. Colkitt*, 259 F.3d 135, 140 (3d Cir. 2001).  Without a valid Rule 54(b) order, we do not ordinarily have appellate jurisdiction over a district court order that resolves fewer than all the claims of all the parties in a single action because such orders do not constitute "final decisions" per 28 U.S.C. § 1291.  *Id*.  As explained below, we hold that the district court properly directed entry of partial final judgment in this case.  Accordingly, we have jurisdiction over all of the consolidated appeals.

---

[8]     Pursuant to Rule 54(b), "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."  However, "[i]n the absence of such determination and direction, any order . . . which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."  Fed. R. Civ. P. 54(b).

The officers claim that Rule 54(b) is not applicable here because the three cases brought by the officers and Robert Murray's case had been consolidated only "for discovery purposes." According to the officers, therefore, the September and October 2002 orders terminated three of these four cases and the District Court lacked jurisdiction to enter a separate final judgment in these cases in January 2003. However, the officers' argument depends on what appears to be a deliberate misreading of the record. In July 2001 the District Court ordered that "the four cases shall be consolidated for *all pretrial proceedings*, with a determination to be made at the final pretrial conference as to whether there will be more than one trial." (Emphasis added.) The court further provided that "all four cases are consolidated into 4:CV-01-0744 as the surviving case." Thus, the four cases were not consolidated only for discovery purposes — they were consolidated for "all pretrial proceedings," including summary judgment proceedings. Thus, as the city correctly argues, a partial final judgment under Rule 54(b) was necessary to terminate Hickey, Hill, and Graham's claims because the September 2002 order granting summary judgment to the city was not final as to Murray's claims. If the District Court had not entered partial final judgment pursuant to Rule 54(b) in January 2003, we would not have had jurisdiction over the officers' appeals of the September and October 2002 orders. *See Berckeley Inv. Group*, 259 F.3d at 139-40; *see also In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 502 (3d Cir. 2001). We affirm the district court's decision to enter partial final judgment in January 2003.

## IV. Standards of Review

We exercise plenary review over the District Court's order granting summary judgment to the city. *Assaf v. Fields*, 178 F.3d 170, 171 (3d Cir. 1999). Accordingly, we apply the same test that the District Court should have applied. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987) (en banc). We review the record as a whole, "draw[ing] all reasonable inferences in favor of the non-moving party" but not weighing the evidence or making

credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If we determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, we will affirm the district court's grant of summary judgment. Fed. R. Civ. P. 56(c).

We review the District Court's denial of leave to amend Hickey's complaint for abuse of discretion. *Lum v. Bank of America* 361 F.3d 217, 223 (3d Cir. 2004). Whether the District Court properly entered final judgment pursuant to Fed. R. Civ. P. 54(b) is a matter of law that we review *de novo*. *Berckeley Inv. Group*, 259 F.3d at 140.

## IV. Discussion

### A. The Officers' First Amendment and Equal Protection Claims

The officers allege that the city terminated them not because they failed to comply with the residency ordinance but because they exercised their First Amendment right to petition the government by suing the city in 1997. We follow a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment. *See Baldassare v. State of New Jersey*, 250 F.3d 188, 195-96 (3d Cir. 2001); *San Filippo v. Bongiovanni*, 30 F.3d 424, 430-31 (3d Cir. 1994); *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir. 1993). First, the employee must show that the activity is in fact protected. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Second, the employee must show that the protected activity "was a substantial factor in the alleged retaliatory action." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct. *Id.*

The officers further allege that the city violated their right to equal protection of the laws under the Fourteenth

10

Amendment by selectively enforcing the ordinance against them while failing to terminate other similarly situated city employees who did not bring suit in 1997. As noted above, we affirmed the District Court's dismissal of the 1997 claim that the residency ordinance violated the equal protection clause on its face. However, discriminatory enforcement of a facially valid law is also unconstitutional under the equal protection clause. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); *Holder*, 987 F.2d at 197 (applying *Yick Wo* to a claim of discriminatory enforcement of a residency ordinance). To establish their selective enforcement claim, the officers must demonstrate 1) that other similarly situated employees were not terminated despite their non-compliance with the ordinance and 2) that this selective treatment was based on an "unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right." *Holder*, 987 F.2d at 197 (citing *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989) (internal quotations omitted). Here, the officers seek to demonstrate that the city singled them out for exercising their fundamental First Amendment right to petition the government when they brought suit against the city in 1997.

The officers' First Amendment and Equal Protection claims are functionally identical and it would be redundant to treat them separately.[9] As a leading treatise explains, "[i]t is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights." Ronald Rotunda & John Nowak, 3 Treatise on Constitutional Law:

---

[9] The officers seek to prove the second prong of their equal protection claim by proving their First Amendment claim. Conversely, the officers' most significant evidence supporting their First Amendment claim is that other similarly situated city employees who did not participate in the 1997 suit were not terminated. This same evidence would also satisfy the officers' burden of proof on the first prong of their equal protection claim.

11

Substance and Procedure § 18.40, at 796 (3d ed. 1999). If a law passes muster under the First Amendment it is also likely to be upheld under the Equal Protection clause. *Id.* Likewise, if a law violates First Amendment rights there is no need to resort to the Equal Protection clause to redress the constitutional violation. *Id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 410 (1963) (no need to examine equal protection claim based on denial of unemployment benefits to individuals whose religious principles prohibit Saturday work where Court held same practice unconstitutional under free exercise clause). We will examine the officers' First Amendment retaliation claim directly rather than as a component of their derivative equal protection claim.[10]

The first prong – whether the relevant activity is protected under the First Amendment – is not contested here. In this circuit, any lawsuit brought by an employee against a public employer qualifies as a protected "petition" under the First Amendment so long as it is not "sham litigation." *San Filippo*, 30 F.3d at 443. The city does not argue that the police officers' 1997 suit against the city was a sham. As for the second and third prongs, we will consider them together because we conclude that the same evidence is sufficient to defeat the city's summary judgment motion with respect to each prong.[11] *See San Filippo*, 30 F.3d at 434, 444 (holding

---

[10] We took the same approach in *San Filippo* but did not provide an explanatory discussion because in that case "the parties agree[d] that the analysis is the same under the first amendment and equal protection claims." 30 F.3d at 430 n.6.

[11] This is a case-specific determination based on the facts before us, not a general principle. There may well be cases in which evidence satisfying the "substantial factor" prong is insufficient to rebut evidence demonstrating that the same adverse employment action would have occurred notwithstanding the protected activity. *See, e.g.*, *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 13-14 (1st Cir. 2003) (assuming plaintiff's evidence satisfied "substantial factor" test but granting summary judgment to defendants based on uncontested evidence that plaintiff would have been

that evidence supporting professor's claim that his protected activities were a "substantial factor" in his termination also rebutted employer's claim that the professor would have been terminated regardless of his protected activities).

We reject the officers' contention that courts may never grant summary judgment on either the second or third steps of this analysis. Although we have often noted that the first prong of the First Amendment retaliation test presents questions of law for the court while the second and third prongs present questions of fact for the jury, *e.g., Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004) (citing *Baldassare*, 250 F.3d at 195), only *genuine* questions of fact should be determined by the jury. For example, in *Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 496 (3d Cir. 2002), we held that judgment as a matter of law under Rule 50(b) should have been granted to the defendant where the plaintiff failed to present sufficient evidence that his protected activity was a substantial factor in his suspension. The same principle applies in the summary judgment context under Rule 56. *E.g., Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3d Cir. 1995) (noting District Court concluded that plaintiff made sufficient showing that speech was substantial factor motivating termination to submit question to jury).

---

terminated anyway). As this court explained in *Suppan v. Dadonna*, "substantial factor" does not mean "dominant" or "primary" factor. 203 F.3d 228, 235 (3d Cir. 2000) (citing *Village of Arlington Heights v. Metro. Housing Development Corp.*, 429 U.S. 252, 265 (1977)). Thus, even if a plaintiff shows that activity protected by the First Amendment was a "substantial factor" in her termination, the defendant may show that some other factor unrelated to the protected activity was the but-for cause of the termination. *Id.* Of course, because the defendant bears the burdens of proof and persuasion on the third prong, *San Filippo*, 30 F.3d at 430 n.7, to prevail at summary judgment on this prong the defendant must present evidence of such quality that no reasonable juror could conclude that the protected activity was the but-for cause of the termination.

13

In this case, the officers satisfied their evidentiary burden on the "substantial factor" prong and sufficiently rebutted the city's evidence that they would have been terminated anyway. The officers' strongest evidence suggests that several non-resident employees who did not participate in the 1997 lawsuit were not terminated despite the city's knowledge or unrebutted suspicions that they lived outside the city.

The District Court in its opinion gives an example of such an employee. After holding that the officers could not substantiate their claim that "similarly situated" employees were allowed to keep their jobs, the court held that Robert Murray had successfully done so. Murray alleged that his neighbor Robert Warner, a firefighter for the city, was not terminated even though they both lived outside the city. The court found that whether Warner actually lived outside the city and whether the city knew of Warner's possible non-compliance were genuine issues of fact for the jury. The court then determined, however, that neither Warner nor any other non-police officer could be "similarly situated" to the police officer plaintiffs because the language defining "bona-fide residence" in the police CBA made the CBA more strict than the residency ordinance itself. The court also found that the city terminated the police officers because of their non-compliance with the CBA, not because of their non-compliance with the residency ordinance. We conclude, however, that the court erred in reaching both conclusions.

First, based on the record on appeal, all city employees subject to the residency ordinance are "similarly situated" for purposes of the First Amendment analysis. The ordinance requires all city employees to establish a "bona-fide residence" in the city of Scranton, but does not define the term. The police CBA explicitly defines "bona-fide residence" to mean "sole legal residence or domicile." However, the police CBA does not purport to alter or augment the residency ordinance by providing this definition. In fact, the police CBA's definition of "bona-fide residence" appears to be lifted directly from *City of Meadville, Firemen's Civil Service Commission v. Neff*, a Pennsylvania

14

Commonwealth Court decision construing a municipal residency ordinance. 450 A.2d 1078, 1079-80 n.3 (Pa. Commw. Ct. 1982) ("Reference to a bona fide residence in a municipal ordinance establishing a residency requirement for municipal employees means the *sole legal residence or domicile* of the employee.") (citation omitted, emphasis added). *See also McCarthy v. Phila. Civil Serv. Comm'n*, 339 A.2d 634, 636-37 (Pa. Commw. Ct. 1975), *aff'd,* 424 U.S. 645 (1976) (holding that "bona fide residence" in municipal residency ordinance means "domicile," and further explaining that a person can have more than one residence but only one domicile). Thus, the residency requirement in the police CBA is not more strict than the ordinance – it is exactly the same.[12] For that reason, the court erred in holding that other city employees were not similarly situated to the officers simply because they were not subject to the police CBA.[13]

Second, the District Court erred by finding that the officers were terminated because of their failure to comply with the police CBA rather than their failure to comply with the ordinance. As just explained, there is no difference between the residency requirements imposed by the police CBA and the ordinance. The distinction made by the District Court could still be relevant, however, to the extent it reflects the city's subjective intent. For example, the city might argue that it only investigated and terminated employees whose unions had agreed to include the residency ordinance in their

---

[12]    In fact, in 1997 the District Court held that "bona fide residence" as used in Scranton's residency ordinance was synonymous with "legal domicile," and we explicitly upheld this determination when we affirmed that decision in 1999. *Kreischer v. City of Scranton*, No. 98-7439, slip op. at n.2.

[13]    We further note that even if the police CBA imposed slightly different residency requirements than the ordinance, the police officers would still be "similarly situated" to other city employees so long as the core residency requirement was the same. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir. 1991) (explaining that "similarly situated" does not mean "identically situated").

15

CBA. This would supply a non-retaliatory explanation for any evidence that certain non-resident employees were not terminated if those employees' unions had not agreed to such inclusion.

Under the facts before the court, however, the question whether the city was willing to enforce the residency ordinance without the supplemental authority of a collective bargaining agreement is a genuine factual issue that the District Court should not have resolved at the summary judgment stage. In late May 2000, the city sent letters to eleven police officers and two firefighters threatening "immediate termination" if the recipients failed to provide updated documents and affidavits establishing their residency in the city. These letters referred to both the residency ordinance and the relevant CBA incorporating that ordinance.[14] However, the pre-termination letters issued to Hill, Hickey, and Graham cite only the residency ordinance. Further, other evidence in the record suggests that the city was willing to rely solely on the residency ordinance. For example, in 1987, long before the ordinance had been incorporated into any CBA, the city controller issued a city-wide request for documentation of residency that threatened termination for non-compliance.

In addition to Robert Warner, the officers provided evidence that at least three other city employees – all police officers who did not sue the city in 1997 – were allowed to remain employed despite the city's knowledge or un-rebutted suspicions that they were not in compliance with the residency ordinance.[15] In June 2000, Ray Mountford, the lead

_____

[14] The firefighters' CBA also incorporated the residency ordinance.

[15] The officers have also attempted to swell the ranks of "similarly situated" employees by listing several golf course employees and temporary summer employees who were not terminated despite city personnel records showing them to have non-Scranton addresses. However, neither of these groups are subject to the residency ordinance, and therefore

16

private investigator working on the residency investigation for the city, was asked to investigate police officers Donald Pettinato and Anthony Gillette. Just after the investigation of Pettinato got underway, however, Mountford was told by the city that Pettinato lived in Old Forge, Pennsylvania, that he was not moving back to the city, and that the investigation should be discontinued. Mountford also testified that his associate determined based on surveillance and public records that Gillette lived in Jessup, Pennsylvania. Mountford's notes from July 7, 2000, indicate that the city had decided to set hearings for Pettinato, Gillette, and Paul Graham, one of the appellants in this case. However, of these three only Graham was terminated for non-compliance with the residency ordinance and it appears that no hearings ever took place with respect to Pettinato and Gillette.[16]

---

the officers cannot reasonably argue that any of these employees are "similarly situated" to them. The golf course is operated by the Scranton Recreation Authority, an independent agency not subject to the control of the city of Scranton. *See Smith v. Athens Township Auth.*, 685 A.2d 651, 656 (Pa. Commw. Ct. 1996) (citation omitted). The Recreation Authority has the sole authority to hire, fire, and set conditions of employment for its employees. *See* 53 Pa. Cons. Stat. § 5607(d). Further, Scranton employees are only required to live in the city during "continuous employment by the city." Temporary summer employees are by definition not continuously employed by the city, and therefore they are not subject to the residency ordinance.

[16] In sharp contradiction to Mountford's testimony, James Connors, the mayor of Scranton, testified that the 2000 investigation revealed that both Pettinato and Gillette lived in Scranton. Connors further testified that the city subsequently ordered a second investigation of Gillette based on a tip that he was living outside the city. According to Connors, Gillette retired during the second investigation. Mountford testified that he was asked to investigate Gillette a second time in August 2001, but that his associate had already determined in 2000 that Gillette lived in Jessup, PA. Even if Gillette ultimately retired under pressure, the fact that the city delayed

17

The officers also showed that the city suspected police officer Patrick Tobin of residing outside the city but may have called off the investigation without adequately rebutting those suspicions. In June 2000, the city asked the private investigators to investigate Tobin, but Mountford and his associate were never able to determine Tobin's residence despite multiple days of surveillance over the course of four months.[17] City records custodian Conall Kolleen later averred that Tobin now resides at a specific address in Scranton. However, the investigators conducted surveillance on this address – which Mountford identified as Tobin's ex-wife's house – and could not determine whether Tobin resided there.

For all the above reasons, the District Court's conclusion that the plaintiff police officers were "the only ones that did not come into compliance with the terms of their CBA" was an improper resolution of a genuine factual dispute.

The officers further contend that they were actually in compliance with the residency ordinance. The officers

enforcing the ordinance against him for over a year nonetheless supports the officers' position. Also, the only evidence of Gillette's forced retirement on this record comes from Mayor Connors, an interested witness. Therefore, this factual issue cannot be resolved on summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149-151 (2000) (explaining that when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses) (citations omitted).

[17] Mountford explained that Tobin was "playing a game" by purposefully eluding the investigators. Mountford's records indicate that Tobin was observed at three different Scranton addresses, including the homes of his ex-wife and daughter, but the investigators could not conclude that Tobin resided at any of these three addresses.

certainly do not need to allege or prove compliance with the ordinance to prevail on their First Amendment claim. Discriminatory enforcement of a statute or ordinance is not justified simply because the enforcement is otherwise valid. *See Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 424-25 (3d Cir. 2003). Evidence of the officers' compliance with the ordinance would nonetheless be powerful evidence that their termination was pre-textual. On this record, no reasonable fact-finder could conclude that either Hill or Hickey came into compliance with the ordinance within the time provided by the city.[18]

Graham, however, should be permitted to argue his case for compliance to the jury. As discussed above, a Scranton employee's "bona-fide residence" is his domicile. In Pennsylvania "[t]he domicile of a person is the place where he has voluntarily fixed his habitation with a present intention to make it either his permanent home or his home for the indefinite future." *In re McKinley's Estate*, 461 Pa. 731, 734 (Pa. 1975). "A new domicile can be acquired only by physical presence at a new residence plus intent to make that new residence the principal home." *In re Prendergast*, 673 A.2d 324, 327-28 (Pa.1996). Graham has established that he became domiciled in Scranton shortly after he was hired as a police officer in 1993. It is the city's burden to demonstrate

---

[18]  Hill was domiciled with her family in Factoryville, PA, at the time of her hire as a police officer in 1990, and no reasonable fact-finder could conclude that she changed her domicile merely by renting an apartment in Scranton and spending the night there "occasionally." Hickey claims that he received an oral waiver of the residency ordinance from the chief of police in 1995, but the ordinance provides that a waiver may only be obtained from the mayor, with the advice and consent of the city council. *See* Ordinance, § 4. Further, his attempt to come into compliance with the ordinance by moving into his house in the city the day before his pre-termination hearing on June 8, 2000, is insufficient. The May 26, 2000, threat letter adequately informed Hickey that he had until June 2, 2000, to come into compliance and supply the requested proof of compliance to the city.

that Graham changed his domicile to Nicholson, Pennsylvania, when he re-married in 1998.[19]  *See In re Prendergrast*, 673 A.2d at 327-28 (noting that the burden of showing changed domicile "rests upon whomever makes the allegation").

The city has introduced more than enough evidence to meet its burden.  First and foremost, the city has shown that Graham's second wife and step-children were domiciled in Nicholson during all times relevant to this dispute.  The location of an individual's family is very strong evidence of the location of his domicile.  Indeed, the Pennsylvania Supreme Court has defined domicile as "the place at which an individual has fixed his family home and principal establishment for an indefinite period of time."  *In re Prendergast*, 673 A.2d at 327 (citing *In re Dorrance's Estate*, 163 A. 303, 175 (1932)); *see also In re Nomination Petitions of McIntyre*, 778 A.2d 746 (Pa. Commw. Ct. 2001).  The city also provided other evidence of changed domicile, including Mountford's testimony that Graham's Scranton apartment was just a "mail drop" being used by both Graham and Hill in an attempt to achieve technical compliance with the residency ordinance despite actually living outside the city.

Nevertheless, Graham has introduced enough evidence to create a genuine factual dispute on this issue.  Graham testified that he moved into Scranton within six months of being hired as a police officer in 1993 to come into compliance with the residency ordinance.  He rented various apartments there until approximately six months after his termination in October 2000.  Graham claims that he and his new wife lived apart from the time of his marriage until after his termination because of his job.[20]  He explained that he

---

[19]  Graham was divorced from his first wife in 1987.

[20]  Graham explained that after he met his second wife, Jacqueline, but before they were married, he might stay in his Scranton apartment three nights a week, at his parents' house in Clarks Summit once or twice a week, and with Jacqueline the remainder of the time.  It appears Graham was never

20

never believed that merely renting an apartment and paying city taxes was sufficient to comply with the residency ordinance; rather, he thought he had to stay in his Scranton apartment "three to five" nights a week. At his pre-termination hearing Graham called four witnesses who attested that they were Graham's neighbors when he lived in the Scranton apartment also claimed by Phyllis Hill. Finally, Graham claims that his wife solely owned the Nicholson home.

Graham's account is self-serving and somewhat unlikely. A person's intent to change domicile is based on "the actual state of facts, not what one declares them to be." *In re Prendergast*, 673 A.2d at 328. However, courts do not weigh evidence or determine credibility questions at the summary judgment stage. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). Viewed in the light most favorable to Graham, a reasonable fact-finder could conclude that Graham made his home in Scranton when he moved there after being hired as a police officer and that he never made Nicholson his principal home after he re-married because he knew that if he did so he would be in violation of the residency ordinance.[21]

The officers also presented additional evidence of retaliation. Without the evidence regarding specific employees described above, we doubt whether this additional

_____

asked about his typical weekly routine after he was married.

[21] Our conclusion on this issue does not compel a similar result in Hill's case. Hill was domiciled in Factoryville with her own family and children when she was hired as a police officer. Hill is listed with her husband on the deed associated with that property. When asked if she slept in her Scranton apartment on a regular basis Hill answered "no." She followed by stating that she slept there "occasionally," but refused to be more specific. She was equally vague when asked how often she ate meals there. Further, while Graham claims that he had a private bedroom in the shared apartment, Hill claims that she slept on a "sofa couch."

21

evidence would be sufficient to meet the officers' burden of rebuttal. However, we need not resolve this question because the sum of all the evidence supporting the officers is sufficient to carry their burden.

First, viewed in the light most favorable to the officers, the residency ordinance had been enforced half-heartedly and sporadically at best prior to the 2000 residency investigation. Since the ordinance's passage in 1980, the city has attempted only twice to collect residency information from all employees – in 1987 and 1997.[22] More important, there is no evidence that prior to June 2000 any employee was disciplined or terminated for failure to comply with the ordinance. The city's sudden vigilance could suggest that the city was motivated at least in part by the officers' participation in the 1997 lawsuit. *See Holder*, 987 F.2d at 197 (noting Holder's allegation that no other city employee had been fired for non-compliance with residency ordinance in ordinance's fourteen-year existence).[23]

---

[22] Roseann Novembrino, the City Controller, testified that she also collected residency information in 1991, but the city produced no records supporting this claim. The fact that the officers do not directly challenge Novembrino's testimony on this point is irrelevant. As noted above, *supra* note 16, when evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant. *See Reeves*, 530 U.S. at 149-151 (citations omitted).

[23] On the other hand, a reasonable fact-finder might conclude that this argument places the cart before the horse. The plaintiffs argued in their 1997 lawsuit that the city intended to begin enforcing the residency ordinance in earnest after years of inattention. In fact, the city's threats of imminent enforcement were the basis of the 1997 lawsuit. Nonetheless, the city did not initiate termination proceedings against anyone prior to the 1997 lawsuit, and a reasonable fact-finder could conclude that the city's vigilance in 2000 was motivated in part by the 1997 suit.

Next, the officers showed that of the initial list of eight names sent to the private investigation firm in May 2000, seven were police officers who sued the city in 1997. The city could respond that shortly thereafter four more police officers were added to the list and that three of these four were not plaintiffs in the 1997 suit.[24] However, the officers' evidence could still reasonably suggest that the city prioritized and targeted the 1997 plaintiffs, especially considering the fact that no police officer who did not sue the city in 1997 was ever terminated for non-compliance with the ordinance.

The officers also showed that the 2000 investigation was not conducted in a systematic fashion. Despite the City Controller's attempt to gather residency information from all city employees in 1997, Mayor Connors was unsure whether his office used that information to determine which employees warranted further investigation. Rather, Mayor Connors and City Attorney James Mulligan testified that the lists of suspicious employees were generated largely from tips from the public or from other city employees. Mayor Connors testified that he was "very satisfied" that the 2000 investigation produced a "complete list" of suspected violators and explained that the city may have used the results of the 1997 request to eliminate from suspicion the majority of city employees. The officers presented evidence, however, that approximately two hundred employees failed to respond to the 1997 request for residency documentation – there were only 445 respondents out of approximately 650 city employees. The city makes no attempt to either contradict or explain this shortfall. The city's failure to conduct a systematic and thorough investigation of all employees, especially of those who raised red flags by failing to respond to the mandatory 1997 request, is consistent with the alleged retaliatory motive.

_____

[24] The city might also argue that it was most likely that the employees who had brought suit were in violation of the ordinance. For that reason, the city started with them. This argument was not, however, made by the city in the District Court.

Further, the temporal proximity between the officers' protected activity and their termination supports an inference of retaliation. The officers lost their case in the District Court in December 1997, but we did not deny their appeal until June 1999. Hickey and Hill were fired within one year of our decision, while Graham's termination followed four months later. We need not, however, decide whether a one-year gap is sufficient to support an inference of retaliation. We have explained that a retaliatory inference based on temporal proximity is strengthened where "the decisionmaker lacked a pretext on which to dismiss the plaintiff until shortly before the time of dismissal." *San Filippo*, 30 F.3d at 444. After the city prevailed in the District Court and before us, it apparently decided to strengthen its position by incorporating the residency ordinance into all of its collective bargaining agreements with the various unions representing city employees.[25] The police CBA containing the new residency provision was ratified on October 28, 1999, and included a six-month grace period to run from the date of ratification. ickey and Hill were investigated in May 2000 and terminated in early June, just a few weeks after the expiration of this grace period. Further, although Graham was not terminated until October 2000, there is evidence that his pre-termination hearing was originally scheduled for July. Under these circumstances there is enough evidence to support a slight inference of retaliation. As in *San Fillipo*, we need not determine whether this evidence would be sufficient absent the additional evidence of retaliation detailed in this opinion. 32 F.2d at 444.

---

[25]   The city's actions may have been motivated by the plaintiffs' claims in 1997 that the residency ordinance was not only unconstitutional but also inconsistent with the police CBA. The District Court acknowledged this claim but never addressed it, and we affirmed the District Court's order without mentioning the CBA claim. Thus, the city may have been concerned that the residency ordinance was still vulnerable to legal challenge, and hence may have sought to eliminate that vulnerability by incorporating the ordinance into all of its collective bargaining agreements.

Finally, the officers presented some evidence that Mayor Connors was particularly concerned with the officers who sued the city in 1997. Hickey testified that Connors asked him at his pre-termination hearing why he participated in the 1997 lawsuit. Further, another police officer testified that Connors had sought "stronger language" regarding residency in the police CBA to ensure that the officers would not be able to further resist the city's enforcement efforts. While these comments are amenable to a non-retaliatory interpretation, a reasonable fact-finder could also conclude, in light of all the other evidence discussed above, that Mayor Connors was unfavorably disposed towards the officers who participated in the 1997 lawsuit.

For all the above reasons, we conclude that the police officers have presented sufficient evidence that the city used the residency ordinance as a pretext for retaliatory terminations in violation of the officers' First Amendment right to petition the government.

## B. Hickey's Post-Termination Hearing Delay Claim

As noted in Part II, Hickey argued in opposition to the city's motion for summary judgment that the lengthy delay in providing his post-termination Municipal Service hearing violated his right to procedural due process. The District Court treated Hickey's argument as a constructive motion to amend his complaint under Federal Rule of Civil Procedure 15(a), which it ultimately denied. We conclude that the District Court did not abuse its discretion or commit any legal error in reaching this decision.

First, we reject Hickey's frivolous argument that his complaint gave effective notice to the city of his post-termination hearing delay claim. Hickey is correct that notice pleading requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), but Hickey's complaint falls far short of this low threshold. Nowhere in the complaint does Hickey even allege

that he requested a Municipal Service hearing, much less that the city failed to timely provide such a hearing. In fact, Hickey's complaint does not allege any facts at all relating to the period after he was terminated in June 2000.

Next, we agree with the District Court that it would have been futile to allow Hickey to amend his complaint because his allegations before the District Court did not state a claim on which he could have obtained relief. While Rule 15(a) provides that leave to amend should be "freely given," a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party. *See, e.g.*, *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Hickey is correct that the due process clause "requires provision of a [post-termination] hearing at a meaningful time." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985). Thus, "there is a point at which an unjustified delay in completing a post-deprivation proceeding would become a constitutional violation." *FDIC v. Mallen*, 486 U.S. 230, 242 (1988) (internal citation omitted). The key point, however, is that the delay must be "unjustified." We have held that the "mere allegation of a . . . twenty-month delay" without supplementary allegations concerning the cause of the delay does not state a constitutional claim. *Ritter v. Cohen*, 797 F.2d 119, 124 (3d Cir. 1986). Before the District Court, Hickey simply stated in conclusory fashion that his due process rights had been violated by "the unwarranted delay of two and [a] half (2 1/2) years." Rather than attempt to explain the cause of the delay, Hickey chose instead to devote the majority of his brief to re-arguing the merits of his First Amendment and equal protection claims. Accordingly, the District Court correctly followed *Ritter* and held that granting leave to amend would be futile.

Hickey now argues for the first time on appeal that the city caused the delay in the Municipal Service Commission proceeding by failing to comply with his legitimate discovery

26

requests. Had this allegation been made in the District Court, the court might not have held that Hickey's attempted amendment was futile. However, the District Court reached the correct result based on the information provided at the time by the parties .[26] Accordingly, we conclude that the District Court did not abuse its discretion by denying leave to amend.[27]

## V. Conclusion

For the foregoing reasons we will vacate the District Court's order granting summary judgment to the city on the officers' First Amendment claims and remand those claims for further proceedings. We will affirm the District Court's orders in all other respects.

---

[26] We note that the District Court might have also relied on Hickey's lack of diligence in timely raising his post-termination due process claim. Hickey filed his original complaint in April 2001, and an amended complaint in December 2001, approximately one and a half years after he was terminated in June 2000. Yet Hickey did not mention any post-termination hearing delay until August 2002, more than two years after his termination. Hickey never attempted to explain to the District Court why he waited more than two years to raise this claim for the first time, nor has he offered any explanation for this delay on appeal.

[27] We need not consider the District Court's alternative conclusion that Hickey's constructive motion to amend was made in bad faith.