# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

THE CITY OF WILMINGTON, a municipal corporation of the State of Delaware,

        Plaintiff,

        v.

WILMINGTON FRATERNAL ORDER OF POLICE LODGE NO.1, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2019-0506-KSJM

## MEMORANDUM OPINION

Date Submitted: October 5, 2020
Date Decided: January 22, 2020

Aaron C. Baker, Robert M. Goff, Jr., Edward J. Kosmowski, CITY OF WILMINGTON LAW DEPARTMENT, Wilmington, Delaware; *Counsel for Plaintiff The City of Wilmington.*

Jeffrey M. Weiner, JEFFREY M. WEINER, ESQUIRE, Wilmington, Delaware; *Counsel for Defendant Wilmington Fraternal Order of Police Lodge No. 1, Inc.*

**McCORMICK, V.C.**

The Charter of the City of Wilmington (the "City") requires that officers of the Wilmington Police Department reside in the City for the first five years of their employment. The Delaware General Assembly did not expressly define "residence" when enacting the City Charter. This litigation requires the court to determine whether Delaware law nevertheless ascribes a fixed meaning to the term so as to remove it from the subject of collective bargaining under the Police Officers and Firefighters' Employment Relations Act (the "Act").

To ensure compliance with the requirement, the City mandates that police officers fill out a declaration of residency form annually. Effective in 2018, the City revised this form to impose a more restrictive definition of residency. Before the revisions, the form required officers to prove that they actually lived at the qualifying residence. As revised, the form required officers to prove that the qualifying residence was their "domicile," defined to mean their "true, fixed, and permanent home" and the place at which "[i]n the absence of marital separation, . . . an employee's spouse and children, if any, reside."[1]

The defendant, the exclusive bargaining representative for City police officers, filed a grievance challenging the City's revisions to the residency form as

---

[1] C.A. No. 2019-0506-KSJM, Docket ("Dkt.") 8, Compendium of Docs. Constituting the Joint Stipulation R. for Cross-Mots. For Summ. J. at JSR056–JSR057, Employee Declaration Form 2018 ("2018 Annual Declaration"). This decision cites to the compendium constituting the joint record by "JSR" number.

a unilateral alteration to a condition of employment subject to mandatory bargaining under the Act. After exhausting contractually-mandated grievance procedures, the defendant filed a demand for arbitration. The arbitrator awarded judgment in favor of the defendant.

The City brought this action to vacate the arbitration award. The City argues that Delaware law equates "residence" with "domicile" and that the revisions conformed the City's form to the legal definition of "residence." The City argues that it lacks the ability to alter the definition imposed by Delaware law through collective bargaining or otherwise and that requiring the City to do so is contrary to law. This decision rejects those arguments and resolves the parties' cross-dispositive motions in favor of the defendant.

I.      FACTUAL BACKGROUND

The background facts are drawn from the parties' pleadings and the documents they incorporate by reference.

A.      The Collective Bargaining Agreement

Delaware adopted the Act "to promote harmonious and cooperative relationships between public employers and their employees," including police officers.[2] The Act grants police officers the right to organize and be represented,[3]

---

[2] 19 *Del. C.* § 1601.

[3] *Id.* § 1601(1).

2

and it obligates public employers to engage in collective bargaining over the terms and conditions of employment.[4] The Act requires that collective bargaining agreements be reduced to writing.[5]

The City is a "public employer" as that term is defined in the Act.[6] The Wilmington Fraternal Order of Police Lodge No. 1, Inc. (the "FOP") is the exclusive bargaining representative for all City police officers from the ranks of Patrol Person to Lieutenant.[7] The Act thus obligates the City to negotiate with the FOP toward a collective bargaining agreement concerning the terms and conditions of FOP members' employment.

On February 1, 2018, the City and the FOP entered into a collective bargaining agreement made effective on July 1, 2016, and continuing until June 20, 2020 (the "Agreement").[8] Section 5.1 of the Agreement requires that all conditions of employment, including those not expressly addressed in the

---

[4] *Id.* § 1601(2); *see also id.* § 1602(e) (defining "collective bargaining").

[5] 19 *Del. C.* § 1601(2).

[6] JSR104, Unfair Labor Practice Charge Complaint ¶ 2; *see also* 19 *Del. C.* § 1602(l) (defining "public employer").

[7] Unfair Labor Practice Charge Complaint ¶ 1; *see also* 19 *Del. C.* § 1602(h) (defining "exclusive bargaining representative").

[8] JSR061–JSR100, City of Wilmington & FOP Lodge #1 Bargaining Agreement.

Agreement, be maintained at the highest standards.[9]  Section 21.1 of the Agreement

provides that it cannot be amended without the written consent of both parties.[10]

###### B.    The Residency Requirement

The City Charter, which is enacted by the General Assembly, requires that

non-elected City employees become City residents within six months and continuing

for the first five years of their appointment or employment (the "Residency

Requirement").[11]  The Delaware Code, also enacted by the General Assembly,

prohibits the City from requiring that "as a condition of continued employment, an

employee with at least 5 years of service for the [City] be, become or remain a

resident of the [City] during their employment."[12]

In order to secure compliance with the Residency Requirement, the

Wilmington Code of Ordinances (the "City Code") provides that City employees

---

[9] *Id.* § 5.1.

[10] *Id.* § 21.1.

[11] Wilm. C. (Charter) § 3-304(b).

[12] 22 *Del. C.* § 841.  Note that 22 *Del. C.* § 841 applies on its face to any "municipal corporation with a population exceeding 50,000," and the court takes judicial notice of the fact that the City is the only municipality in Delaware with a population exceeding 50,000. *See id.*; *see also* Wilm. C. (Charter) § 3-304(b) ("All officers, regular employees, and probationary employees of the city shall be residents of the city at the time of their election, appointment, or employment and remain such during their tenure, except as provided herein. . . .  Employees who are subject to the requirements of Title 22 of the Delaware Code, Section 841, regarding duration of employment, shall not be subject to the residency requirement after first meeting the requirements of that section.").

shall file an annual declaration of residency "on a form approved by the administrative board" (the "Annual Residency Declaration").[13]

Neither the Delaware Code, nor the City Charter, nor the City Code define "residence" for the purpose of the Residency Requirement.[14] The Agreement also does not define the term.[15] The Annual Residency Declaration, therefore, supplies the only affirmative definition of residency applied by the City to FOP members.

Beginning in 2005, the Annual Residency Declaration defined "residence" as follows:

> A person's residence is that dwelling or abode, where one actually lives. It refers to one's home, the place that is the center of the person's non-working hours. This will ordinarily be the place where one normally eats, sleeps, and keeps his or her personal and/or household effects.[16]

The City Code also requires that the Wilmington Police Department adopt internal rules and regulations subject to review by the City's Administrative Board and others.[17] One rule and regulation adopted and approved in 2005 pursuant to this

---

[13] Wilm. C. § 2-151(a).

[14] *See* JSR192–214, Arbitration Award at 6; *see also* 22 *Del. C.* § 801; Wilm. C. (Charter) § 3-304; Wilm. C. § 2-151.

[15] *See* Agreement.

[16] *See* JSR050–JSR051, 2017 Annual Residency Declaration at 1 (stating that the form was reviewed by the Administrative Board on August 23, 2005). The 2017 Annual Residency Declaration also states: "Failure to file such declaration or making a false statement therein shall be cause for disciplinary action up to and including discharge." *Id.*

[17] Wilm. C. § 40-246 ("The rules and regulations of the police and fire departments as

5

requirement, "Directive 6.56," uses the same definition of "residence" found in the 2005 Annual Residency Form.[18]

### C.    The City Revises the Annual Residency Declaration.

In October 2016, the City began internal discussions regarding revisions to the Annual Residency Declaration.[19] The City's Director of Human Resources, Charlotte Barnes, testified in the Arbitration proceedings concerning these discussions.[20]

The FOP was not invited to participate in those discussions.[21] Nor did the City provide notice of the discussions to the FOP pursuant to Section 22.2 of the Agreement.[22]

On October 12, 2017, Barnes recommended to the City's Residency Review Board that the definition of "residence" in the Annual Residency Declaration be

---

recommended by the chiefs of police and fire, subject to review by the director of personnel or designee and approved by the administrative board, shall constitute the personnel rules for uniformed members of the departments.").

[18] *See* JSR003–JSR006, Wilmington Police Directive 6.56 ("Directive 6.56") at 1–2 (dated October 11, 2005).

[19] Arbitration Award at 6–7; *see also* JSR055, City of Wilmington Administrative Board Agenda for October 26, 2017 Meeting.

[20] Arbitration Award at 6 (discussing testimony of Director Barnes).

[21] *See id.*

[22] *Id.* at 5–6 (discussing testimony of President Bozeman and noting that Section 22.2 of the Agreement requires that "[i]f either party gives notice requesting changes to this agreement, the parties will endeavor to promptly begin negotiations").

revised.[23] From her perspective, the revisions were motivated by a desire "to respond to confusion from employees as to how to meet the residency requirement and to provide additional guidance on that issue."[24] She believed that the revisions conformed the City's form to the legal definition of "residence"—the revision was "a change in form rather than an actual change in definition."[25] She testified that "it was not her intent to impose additional restrictions on employees."[26]

The Residency Review Board approved the revised definition at the meeting.[27] The City's Administrative Board then adopted the revised definition on October 26, 2017.[28] This decision refers to the revised definition as the "2018 Definition" and the definition applied prior to 2018 as the "Pre-2018 Definition."

The 2018 Definition defines "residence" as follows:

> For purposes of the City's residency requirement, an employee's residence is his/her domicile, i.e., that place where the employee has his/her true, fixed, and permanent home. It is also the dwelling where the employee actually lives. It is the place where the employee eats, sleeps, and keeps his/her personal belongings. It is the place that is the center of the employee's non-working hours. In the

---

[23] *Id.* at 7; *see also* JSR053–JSR054, Minutes of City of Wilmington Residency Review Board for October 12, 2017 Meeting.

[24] Arbitration Award at 6.

[25] *Id.* at 7–8.

[26] *Id.* at 7.

[27] *Id.*; *see also* Minutes of City of Wilmington Residency Review Board for October 12, 2017 Meeting.

[28] Arbitration Award at 7.

absence of a marital separation, it is the dwelling at which an employee's spouse and children, if any, reside.[29]

The 2018 Definition implements two significant revisions to the Residency Requirement. The first is that it equates "residence" with "domicile," which the 2018 Definition goes on to define as "that place where the employee has his/her true, fixed, and permanent home."[30] The second, which one might interpret as an extension of the shift to a "domicile"-focused definition, requires not only that the municipal employee live within the City limits, but also that (absent "marital separation") the employee's "spouse and children, if any, reside" in the City.[31] This decision refers to these two revisions as the "true-fixed-permanent test" and the "family-lives-there test," respectively.

### D. The FOP Files a Grievance and Arbitration Challenging the Revision to the Annual Residency Declaration.

As required by the Act,[32] the Agreement provides a process by which the FOP or employees may file grievances.[33] If that process is followed and the grievance is

---

[29] 2018 Annual Declaration.

[30] *Id.*

[31] *See id*.

[32] 19 *Del. C.* § 1613(c) ("The public employer and the exclusive bargaining representatives shall negotiate written grievance procedures by means of which bargaining unit employees, through their collective bargaining representatives, may appeal the interpretation or application of any term or terms of an existing collective bargaining agreement; such grievance procedures shall be included in any agreement entered into between the public employer and the exclusive bargaining representative.").

[33] Agreement §§ 4.1–4.5.

not satisfactorily resolved, the Agreement permits the FOP to appeal to an impartial arbitrator.[34]

On January 16, 2018, the FOP filed a grievance with the Chief of Police claiming that the 2018 Definition constituted a unilateral modification of a mandatory subject of bargaining under the Act.[35] The Chief of Police denied the FOP's grievance on April 10, 2018.[36]

On April 20, 2018, the FOP filed an Unfair Labor Practice Charge Complaint with the Public Employment Relations Board for the State of Delaware (the "PERB").[37] The City asked the PERB to defer on the complaint pending resolution of the arbitration award.[38] On August 21, 2018, the PERB determined that the FOP's complaint was sufficient to establish that the City may have violated the Act by failing to negotiate the residency requirement.[39] The PERB deferred resolution of the complaint to the negotiated grievance and arbitration procedure.[40]

---

[34] *Id.* § 4.6.

[35] *See* JSR058–JSR060, FOP Lodge #1 Grievance Letter.

[36] JSR101–JSR102, City's Denial of Grievance Letter.

[37] JSR104–JSR108, FOP Lodge #1's Unfair Labor Practice Charge Complaint.

[38] JSR109–JSR114, Respondent City of Wilmington's Answer with New Matter to the Unfair Labor Practice Charge Complaint of the Fraternal Order of Police Lodge No. 1 ¶¶ 13–16.

[39] JSR118–JSR124, Public Employment Relations Board Probable Cause Determination and Order of Deferral at 7.

[40] *Id.*

Also on April 20, 2018, the FOP filed a demand for arbitration against the City asserting the same claim and seeking the same relief as presented in the initial grievance.[41] In light of a settlement agreement reached in another matter, the City agreed to use the Pre-2018 Definition of "residence" pending resolution of the proceeding.[42]

## E. The Arbitrator Sustains the FOP's Grievance.

An arbitration hearing was held on February 21, 2019,[43] and the parties completed post-hearing briefing on April 23, 2019.[44] During the arbitration, the City argued that the residence requirement is not a mandatory subject of bargaining but, rather, a prohibited subject of bargaining in view of the General Assembly's enactment of the Residency Requirement.[45] The City took the position that the 2018 Definition is consistent with the meaning of "residence" applied by Delaware courts and used in the City Charter.[46] Accordingly, the City did not impose a

---

[41] *See* JSR103, FOP Lodge #1's Demand for Arbitration.

[42] Arbitration Award at 12–13.

[43] *Id.* at 1.

[44] *See* JSR128–JSR155, Post-Hearing Opening Brief of Petitioner Wilmington Fraternal Order of Police Lodge #1; JSR156–JSR175, Respondent City of Wilmington's Post-Hearing Answering Brief; JSR176–JSR185, Post-Hearing Reply Brief of Petitioner Wilmington Fraternal Order of Police Lodge #1; JSR186–JSR191, Respondent City of Wilmington's Post-Hearing Sur-Reply Brief.

[45] Arbitration Award at 16–18.

[46] *Id.*

condition on employment different from that imposed by the City Charter and thus had no obligation to bargain.[47]

On May 26, 2019, the arbitrator issued an opinion and award (the "Arbitration Award") rejecting the City's arguments and sustaining the grievance.[48] The arbitrator concluded that residency is a mandatory subject of bargaining absent a residency requirement imposed by a higher-level entity.[49] The arbitrator next observed that no Delaware court has defined "residence" for the purpose of enforcing the Residency Requirement, and the requirement itself does not include a definition of the term "residence."[50] Moreover, the Act "clearly defines those matters that are not subject to bargaining by public employers," and a residency requirement is not one of those matters.[51] The arbitrator concluded that absence of a precise definition, along with no language clearly prohibiting bargaining over the Residency Requirement, suggests that "the City enjoys a certain level of discretion in defining that term."[52] The arbitrator further observed that the 2018 Definition "materially altered [the meaning] . . . rather than simply clarifying [it]"[53] and that

---

[47] *Id.* at 18.

[48] *Id.* at 18–23.

[49] *Id.* at 20.

[50] *Id.*

[51] *Id.* at 21.

[52] *Id.* at 20.

[53] *Id.*

11

the revision thus constituted a unilateral alteration to the conditions of employment that violated Article 5 of the Agreement.[54]

The arbitrator directed the City to continue using the Pre-2018 Definition until the FOP agreed to change it or the General Assembly enacted a change regarding the definition of "residence."[55]

### F. The City Files This Action.

On June 28, 2019, the City filed this action seeking to vacate the Arbitration Award.[56] The FOP filed its answer on August 26, 2019.[57] The parties stipulated that "all pertinent facts to the resolution of any issues presented by the Complaint and Answer are set forth in the record" and agreed to resolve the action by cross-dispositive motions.[58] Initially, the FOP filed a motion for judgment on the pleadings, and the City filed a motion for summary judgment.[59] The FOP appears to have subsequently agreed to convert its motion for judgment on the pleadings into a cross-motion for summary judgment, and the parties stipulated to a record.[60] The

---

[54] *Id.* at 18, 21–22.

[55] *Id.* at 23.

[56] Dkt. 1, Verified Compl. to Vacate Arbitration Award ("Compl.").

[57] Dkt. 5, Answer of Def. to Verified Compl. to Vacate Arbitration Award.

[58] Dkt. 7, Stipulation and Order for Briefing Schedule, Recitals at 1.

[59] *See* Dkt. 10, Mot. for J. on the Pleadings; Dkt. 12, City of Wilmington's Mot. for Summ. J.

[60] *See* Dkt. 14, Letter to the Honorable Kathaleen S.J. McCormick Enclosing Two Courtesy Copies of the City of Wilmington's Opening Br. in Supp. of Its Mot. for Summ. J. Along

12

cross-motions were fully briefed on March 18, 2020.[61]  The court held oral argument

on October 5, 2020.[62]

## II.    LEGAL ANALYSIS

Court of Chancery Rule 56 provides that summary judgment is appropriate

when "there is no genuine issue as to any material fact and . . . the moving party is

entitled to a judgment as a matter of law."[63]  Summary judgment is not warranted,

however, "if the parties are in disagreement concerning the factual predicate for the

legal principles they advance."[64]  In deciding whether to grant summary judgment,

the court typically must view the evidence in the light most favorable to the non-

With the Compendium of Docs. Constituting the Joint Stipulated R. for Cross Mots. For Summ. J. (enclosing "the Compendium of Documents Constituting the Joint Stipulated Record for *Cross-Motions for Summary Judgment*" (emphasis added)).  For avoidance of doubt, because matters outside of the pleadings have been presented by stipulation and thus not excluded by the court, this decision treats the FOP's motion for judgment on the pleadings "as one for summary judgment and disposes of it as provided in Rule 56," as permitted by Rule 12(c).  *See* Ct. Ch. R. 12(c).

[61] *See* Dkt. 11, Opening Br. of Def. Wilmington Fraternal Order of Police Lodge #1 in Supp. of its Mot. for J. on the Pleadings ("Def.'s Opening Br."); Dkt. 12, City of Wilmington's Opening Br. in Supp. of Its Mot. for Summ. J. ("Pl.'s Opening Br."); Dkt. 15, Answering Br. of Def. Wilmington Fraternal Order of Police Lodge #1 in Opp'n to Pl. City of Wilmington's Mot. for J. on the Pleadings ("Def.'s Answering Br."); Dkt. 16, City of Wilmington's Answering Br. in Opp'n to Def.'s Mot. for J. on the Pleadings ("Pl.'s Answering Br."); Dkt. 17, Reply Br. of Def. Wilmington FOP Lodge #1 in Supp. of Its Mot. for J. on the Pleadings ("Def.'s Reply Br."); Dkt. 18, Letter to Ct. Concerning Waiver of City of Wilmington's Reply Br. in Supp. of Its Mot. for Summ. J.

[62] Dkt. 23, Tr. of October 5, 2020 Oral Arg. on Pl.'s Mot. for Summ. J. and Def.'s Mot. for J. on the Pleadings.

[63] Ct. Ch. R. 56(c).

[64] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992).

moving party.[65] But where, as here, the parties have agreed that there is no genuine issue of material fact, the court "shall deem the [cross-motions] to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[66] In such situations, "the general standard of drawing inferences in the light most favorable to the nonmoving party does not apply."[67]

Public policy supports "arbitration as a means of resolving labor disputes" and accordingly limited judicial review of arbitration awards.[68] As the Delaware Supreme Court has instructed, "review of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence."[69]

This court will not vacate an arbitration award unless: "(a) the integrity of the arbitration has been compromised by, for example, fraud, procedural irregularity, or

---

[65] *E.g. Merrill*, 606 A.2d at 99.

[66] *See* Ct. Ch. R. 56(h); *see also Williams Cos. v. Energy Transfer LP*, 2020 WL 3581095, at *11 (Del. Ch. July 2, 2020) ("Where the parties file cross-motions for summary judgment and 'have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.'" (quoting Ct. Ch. R. 56(h)).

[67] *ION Geophysical Corp. v. Fletcher Int'l, Ltd.*, 2010 WL 4378400, at *5 (Del. Ch. Nov. 5, 2010); *accord. Jackson Walker L.L.P. v. Sipra Footwear, Inc.*, 2008 WL 2487256, at *3 (Del. Ch. June 23, 2008); *Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 18 (Del. Ch. 2005).

[68] *AFSCME, Council 81, Registered Nurses Unit, Loc. 2305 v. State*, 2014 WL 1813279, at *2 (Del. Ch. Apr. 30, 2014).

[69] *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014) (quoting *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Secs., Inc.*, 953 A.2d 726, 732 (Del. Ch. 2008)).

14

a specific command of law; (b) the award does not claim its essence from the [collective bargaining agreement]; or (c) the award violates a clearly defined public policy."[70]

The City's primary argument is that the Arbitration Award should be vacated because it is contrary to a specific command of law—i.e., the Residency Requirement—although the City frames that argument as a public policy issue. The City then redeploys this premise to contend that the Arbitration Award does not draw its essence from the Agreement. This decision rejects the premise the Arbitration Award is contrary to the Residency Requirement. Thus, regardless of whether the City's arguments are framed as "command of law," "public policy," or "essence from the agreement" theories, they all suffer from the same flawed premise and fail to support vacating the Arbitration Award.

## A.     The Arbitration Award Is Not Contrary to Law.

Section 1613 of the Act states that "no collective bargaining agreement shall be valid or enforceable if its implementation would be . . . contrary to law."[71] This

---

[70] *E.g.*, *State v. Corr. Officers Ass'n of Del.*, 2016 WL 6819733, at *8 (Del. Ch. Nov. 18, 2016) (alteration in original) (quoting *Meades v. Wilm. Hous. Auth.*, 2003 WL 939863, at *4 (Del. Ch. Mar. 6, 2003)); *see* 10 *Del. C.* § 5714.

[71] 19 *Del. C.* § 1613(e).

aspect of the Act codifies the common law principle that courts may not enforce "an illegal contract prohibited by law."[72]

The City argues that the Arbitration Award runs contrary to law by binding the City to a definition of "residence" that is inconsistent with the City Charter.[73] It is true that the City's administrative powers and contractual freedoms are limited by and must be applied in a manner consistent with the City Charter.[74] Thus, the Arbitration Award cannot require the City to adopt a definition of "residence"

---

[72] *See, e.g.*, *Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965) (holding that "it is against the public policy of this State to permit its courts to enforce an illegal contract prohibited by law"); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *80 (Del. Ch. Nov. 30, 2020) (holding that "[a]s a general matter, parties are obligated to comply with the law, and Delaware law does not permit a court to enforce a contract prohibited by law").

[73] Pl.'s Opening Br. at 11–25.

[74] *See* Wilm. C. (Charter) § 1-101; *Schadt v. Latchford*, 843 A.2d 689, 691 (Del. 2004). The City Charter "stands as its constitution," and "charter amendments must be enacted by referendum or by an act of the General Assembly with approval of two-thirds of all members of each house." *Schadt*, 843 A.2d at 691; *accord. Smithers v. Bracebridge Corp.*, 2005 WL 8150129, at *2 (Del. Ct. Com. Pl. Nov. 4, 2005). As the Delaware Supreme Court held in *Schadt*, "the City enjoys complete powers of legislation and administration relating to its municipal functions, but only within the scope of the powers conferred by the General Assembly through the City's Charter." 843 A.2d at 691–94 (invalidating a City ordinance requiring landowners to maintain public sidewalks abutting their property where the City Charter states that the City must maintain public sidewalks); *see also Lemos v. Willis*, 858 A.2d 955, 957–59 (Del. 2004) (applying *Schadt* to invalidate a City ordinance requiring private landowners to remove ice and snow from public sidewalks abutting their property). In *Schadt*, the court held that the City's ordinance "must conform to, be subordinate to, not conflict with, and not exceed the [City Charter]," but the principles apply equally to the City's exercise of administrative powers and contractual freedoms. *See* 843 A.2d at 692.

inconsistent with the Residency Requirement. The City argues that the Arbitration Award does so by binding it to the Pre-2018 Definition.[75]

The foundation of the City's argument is that Delaware law interprets the term "residence" as used in the Residency Requirement to mean "domicile."[76] The City acknowledges that neither the City Charter nor the Delaware Code expressly define "residence." [77] The City thus draws support from decisional and secondary authorities.

The City first cites to two Delaware Superior Court cases— *Mitchell v. Delaware State Tax Commissioner* and *Williamson v. Standard Fire Insurance Co.*[78] In the first decision, the court held that "'residence' is synonymous with the legal term 'domiciled.'"[79] In the second decision, the court observed that "[i]n Delaware, the term 'resident' is often equated with the legal term of 'domicile.'"[80]

---

[75] Pl.'s Opening Br. at 11–25.

[76] *Id.* at 19–25.

[77] *Id.* at 19–20.

[78] *See id.* at 21 (first citing *Mitchell v. Del. State Tax Comm'r*, 42 A.2d 19, 21 (Del. Super. 1945); and then citing *Williamson v. Standard Fire Ins. Co.*, 2005 WL 6318348, at *5 (Del. Super. Aug. 19, 2005)).

[79] *Mitchell*, 42 A.2d at 21.

[80] *Williamson*, 2005 WL 6318348, at *5.

The City's reliance on these two cases is misplaced. As this court has previously explained, the terms "resident" and "residence" are used throughout the Delaware Constitution and Delaware statutes.[81] They have "various statutory meanings" and "different connotations in different statutes and situations."[82] The precise meaning of the term is "dependent upon the context of the statute in which they are used."[83] The term "resident" does not equate to "domicile" for all purposes under Delaware law.[84]

Neither *Mitchell* nor *Williamson* address the meaning of the term "residence" in the relevant context—the Residency Requirement. *Mitchell* is a 1945 voting rights case where the court interpreted the word "resident" in inapposite provisions of the Delaware Constitution and a 1935 statute.[85] *Williamson* did not involve a statutory definition at all, but rather, a dispute over a homeowners' insurance

---

[81] *Wife v. Husband*, 271 A.2d 51, 52 n.2 (Del. Ch. 1970).

[82] *Id.*

[83] *Id.*; *see also Miller v. Bd. of Adjustments of Town of Dewey Beach*, 1995 WL 465183, at *4 (Del. Super. June 30, 1995) ("'[R]esident' and 'residence' are words having various statutory meanings dependent upon the context of the statute in which they are used. Such words have different connotations in different statutes and situations. They must be construed in the light of the purpose of the statute in which they appear and the result designed to be accomplished by their use.").

[84] *See, e.g.*, *In re Joseph E. Churchman Guardianship*, 1987 WL 10013, at *3–4 (Del. Ch. Apr. 28, 1987) (noting that "the word 'resident' has different connotations in different statutes and must be construed in light of the purpose of the statute in which it appears" and holding that equating "resident" with "domicile" would be inequitable in the guardianship context).

[85] *See* 42 A.2d at 20–21.

18

policy.[86] In that context, the court canvassed multiple authorities to ascertain the parties' intended meaning.[87] In the end, although the court observed that "[i]n Delaware, the term 'resident' is often equated with the legal term of 'domicile,'" the court did not hold that the terms were synonymous for all purposes under Delaware law.[88]

The City also cites to decisions from other jurisdictions holding that "residence" and "domicile" are interchangeable for the purposes of residency requirements.[89] But none of these cases compel the conclusion that the General

---

[86] 2005 WL 6318348, at *1–3.

[87] *See id.* at *3–5.

[88] *Id.* at *5. Even if the City's cases stood for the proposition that "residence" means "domicile," they do not stand for the proposition that the 2018 Definition accurately captures that meaning. In *Mitchell*, the court did not offer an affirmative definition for domicile. *See* 42 A.2d at 21–23. In *Williamson*, the court defined "domicile . . . to require bodily presence plus the intent to make the place one's home," but it made no mention of the "true, fixed, permanent" or "absent marital separation" provisions found in the 2018 Definition. *See* 2005 WL 6318348, at *3–5.

Although uncited by the City, it bears noting that numerous other cases have quoted the language of *Williamson* on which the City relies. *See, e.g.*, *McGinnes v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 5347136, at *3 (Del. Super. Sept. 24, 2013) ("In Delaware, the term 'resident' is often equated with the legal term of 'domicile.'" (quoting *Williamson*, 2005 WL 6318348, at *5)); *Boyer v. Sylvester*, 2011 WL 2671872, at *6 (Del. Ct. Comm. Pl. July 1, 2011) (same). And at least one older case uses similar language. *See Gahn v. Gahn*, 116 A.2d 902, 903 (Del. Super. 1955) ("I take it that both parties concede that the words 'bona fide resident' as used in Title 13 Del. C. § 1525 are synonymous with domicile."). Still, none of these decisions involve apposite context or inform the issue at hand.

[89] *See* Pl.'s Opening Br. at 21–22 (citing *Hill v. City of Scranton*, 411 F.3d 118, 127–28, 130–31 (3d Cir. 2005); *Vasquez v. Milwaukee City Board of Fire & Police Comm'ns*, 2010 WL 2364433, at *2–3 (Wisc. Ct. App. June 15, 2010); *In re Ball*, 896 N.Y.S.2d 489,

Assembly intended that the terms be used interchangeably in the Residency Requirement or to have the fixed meaning the City ascribed to them.

Lacking support in decisional authority, the City turns to two secondary authorities—a passage from a leading municipal governance treatise, Eugene McQuillin's *The Law of Municipal Corporations*, and a definition from Black's Law Dictionary.[90]

The passage from the McQuillin treatise seems supportive of the City's argument at first glance, as it begins with the statement: "'Residence' has been defined as the place of one's domicile. . . ."[91] This initial statement, however, is followed by a disjunctive list including multiple more lenient definitions of "residence":

---

489 (N.Y. App. Div. 2010); *Ferguson v. Bd. of Police Comm'rs*, 782 S.W.2d 814, 816–17 (Mo. Ct. App. 1990); *Fagiano v. Police Bd. of Chi.*, 456 N.E.2d 27, 29–31 (Ill. 1983); *Choike v. City of Detroit*, 290 N.W.2d 58, 60–61 (Mich. Ct. App. 1980); *Rodgers v. Unemployment Comp. Bd. of Rev.*, 397 A.2d 1286, 1287 (Pa. Commw. Ct. 1979); *Mercadante v. Paterson*, 266 A.2d 611, 613 (N.J. Super. Ct. Ch. Div. 1970), *aff'd* 275 A.2d 440 (N.J. 1971)).

[90] *See* Pl.'s Opening Br. at 22–24 (citing 16A Eugene McQuillin, *The Law of Municipal Corporations* § 45:68 (3d ed. 2011); *Domicile*, Black's Law Dictionary (6th ed. 1990)). The City cites to outdated versions of both of these secondary sources. The court cites to the most recent versions, but the distinction is immaterial for the purpose of these definitions.

[91] *See* 16A Eugene McQuillin, *The Law of Municipal Corporations* § 45:81, at 634 (3d rev. ed. 2020) [hereinafter *Municipal Corporations*]. McQuillen's treatise has been cited favorably by the Delaware Supreme Court. *See, e.g.*, *Hines v. New Castle Cnty.*, 640 A.2d 1026, 1029 (Del. 1994); *Dover v. Kelley*, 327 A.2d 748, 754 (Del. 1974); *New Castle Cnty. v. New Castle*, 372 A.2d 188, 190 (Del. 1977); *Wilmington v. Smenthkowski*, 198 A.2d 685, 686 (Del. 1964).

> "Residence" has been defined as the place of one's domicile, i.e., the place where one usually eats, sleeps and maintains one's personal and household effects; the place where a person is qualified to vote; the place where a person has an extended, continual presence; the place where an employee's house or other dwelling place is located; or the place where an employee has a permanent home or abode.[92]

The parallel structure created by the repetition of the phrase "the place," following the signal "i.e.," and coupled with the use of the disjunction "or," reveals that the treatise's author viewed "the place" clauses as equally viable definitions of "domicile" for the purpose of defining "residence." Of those clauses, only one uses the phrase "permanent" so as to be similar to the true-fixed-permanent test. None expressly include the family-lives-there test. The majority are comparable to the Pre-2018 Definition.[93]

Continuing on, the treatise passage describes the question of "residence" as a fact-intensive inquiry that involves consideration of a number of factors:

> Whether a residence is maintained at the place claimed by the employee is a question of fact determined by the employee's intent as evidence by the surrounding facts.

---

[92] *Municipal Corporations* § 45:81, at 634–35.

[93] *Compare* Pre-2018 Definition ("A person's residence is that dwelling or abode, where one actually lives. It refers to one's home, the place that is the center of the person's non-working hours. This will ordinarily be the place where one normally eats, sleeps, and keeps his or her personal and/or household effects."), *with Municipal Corporations* § 45:81, at 634–35 (referring to "the place where one usually eats, sleeps and maintains one's personal and household effects; . . . the place where a person has an extended, continual presence; the place where an employee's house or other dwelling place located; or the place where an employee has a permanent home or abode").

The courts consider a number of different facts to determine the ultimate fact, namely, whether the employee resides within the required area. Among the facts considered for this purpose are: whether the employee owns or rents property within the prescribed area; whether the employee owns or rents property elsewhere; where the person's spouse and children live and where the children attend school, and if there are separate residences, are there separate residences because of marital difficulties or divorce; whether there are utilities maintained and used in the place claimed to be the person's residence; the address used on tax returns; the amount of time spent at each residence; the place where one votes or uses a voting address; and where one's clothes and personal belongings are kept.[94]

When quoting from this part of the passage in briefing, the City emphasizes in bold the clause similar to the family-lives-there test, which considers "where the person's spouse and children live" and "if there are separate residences . . . because of marital difficulties."[95] The City emphasizes this language as if to suggest that the family-lives-there clause is essential to the definition of "residence." The treatise, however, merely lists factors to take into consideration when determining residency—any factor might be sufficient and none are identified as essential. In fact, the treatise directly acknowledges that "[t]here are numerous definitions as to what 'residency'

---

[94] *Municipal Corporations* § 45:81, at 635–37.

[95] *See* Pl.'s Opening Br. at 23–24.

means within the context of a statute, ordinance or regulation requiring continuous residency as a requirement for continued employment."[96]

On the whole, therefore, the McQuillan treatise does not support the proposition that "residence" has the one fixed meaning that the City seeks to ascribe to it—the 2018 Definition. Rather, it supports the proposition that "residence" can have multiple meanings. Because the treatise is specific to the area of law at issue, it is a powerful strike against the City's position.

The City also relies on Black's Law Dictionary,[97] which defines "domicile" as:

> The place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere.[98]

This definition does not support the City's argument that "residence" must mean "domicile." Indeed, Black's Law Dictionary defines "residence" elsewhere as "[t]he place where one actually lives, *as distinguished from a domicile*,"[99] a definition

---

[96] *Municipal Corporations* § 45:81, at 634.

[97] Pl.'s Opening Br. at 22–23.

[98] *Domicile*, Black's Law Dictionary (11th ed. 2019).

[99] *Residence*, Black's Law Dictionary (11th ed. 2019) (emphasis added). The City also cites to American Jurisprudence, which states that "[t]he law sometimes equates 'legal residence' with domicil while using 'actual residence' to refer to one's present physical location." Pl.'s Opening Br. at 21 n.45 (quoting 25 Am. Jur. 2d *Domicil* § 9 (2014)). But the supplement to that section of American Jurisprudence further states that "[a] person

---

23

expressly distinguishing between the terms that the City seeks to conflate. At most, the definition provides some support for including the true-fixed-permanent test in the definition of "domicile." Standing alone, it does not compel that conclusion. It does not even mention the other language added to the 2018 Definition—the family-lives-there test. Like the treatise passage, therefore, the Black's Law Dictionary definition offers no support for and in fact seems to undermine the City's position.

In sum, the authorities cited by the City reveal that the term "residence" can have multiple meanings. Its meaning can range from the more lenient definitions like the Pre-2018 Definition to the more restrictive definitions like the 2018 Definition. The City fails to persuade the court that the General Assembly intended to impose one fixed definition on this spectrum when enacting the Residency Requirement, much less the 2018 Definition. (Given that the City approved Directive 6.56 and applied the Pre-2018 Definition for over a decade, this result should be unsurprising.) Because the statute lacks one fixed meaning among many possible options, it leaves room to bargain over the meaning of "residence" for the purpose of the Residency Requirement. Thus, the Arbitration Award did not run contrary to law by requiring the City to do so.

---

may have two places of 'residence,' as in the city and country, but only one domicile." 25 Am. Jur. 2d *Domicil* § 9 (2020). This definition therefore does not support the City's contention that "residence" must mean "domicile."

## B. The Arbitration Award Is Not Contrary to Public Policy.

This court will not enforce an arbitration award that interprets a collective bargaining agreement in a manner that is contrary to public policy.[100] To warrant vacating an arbitration award, the public policy relied on must be explicit, well-defined, and "ascertain[able] by reference to the laws and legal precedents and not from general considerations of supposed public interests."[101] The public policy at issue must also be "dominant,"[102] a requirement that calls for an analysis of other applicable policy considerations.

To argue that the Arbitration Award violates Delaware public policy, the City primarily recasts the argument rejected above that the Arbitration Award is "contrary to express Delaware law."[103] As discussed above, contrary to the City's assertions, there is no express Delaware law interpreting the Residency Requirement to require the 2018 Definition. The City's policy argument thus fails in this respect.

---

[100] *E.g.*, *City of Wilmington v. AFSCME, Council 81, Loc. 1102*, 2003 WL 1530503, at *4 (Del. Ch. Mar. 21, 2003).

[101] *Id.* (alteration in original); *accord. Fraternal Ord. of Police Del. Lodge 10 v. State*, 2017 WL 6055375, at *2 (Del. Ch. Dec. 7, 2017) ("A public policy is well-defined and dominant if it may be ascertained from law and legal precedent.").

[102] *AFSCME*, 2003 WL 1530503, at *4 (quoting *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of the United Rubber, Cork, Linoleum and Plastic Workers of Am.*, 461 U.S. 757, 766 (1983)).

[103] Pl.'s Answering Br. at 18.

In further support of its policy argument, the City draws on authorities from other jurisdictions.[104] For example, the City cites to a 1970 decision of the New Jersey Superior Court, *Mercadante v. City of Paterson*, that interpreted the term "residence" for the purpose of a municipal residency requirement.[105] The court found that although "[r]esidence . . . need not be[] equated with domicile,"[106] the policy rationale for the residency requirement called for such an interpretation: "Since the requirement we are considering is intended to foster the public interest as so defined, no casual residence was intended but rather a real and principal residence, in short, domicile. Nothing less will create that identity with the community . . . ."[107] The court held that the plaintiff employees did not meet the residency requirement because they were not domiciled in the municipality.[108]

---

[104] *See, e.g.*, Pl.'s Opening Br. at 13 (arguing that "[b]y requiring that municipal employees be residents of the City of Wilmington (at least for five years), the General Assembly concluded that 'the public interest is advanced by residence within the political unit which provides the pay' and 'that residence will supply a stake or incentive for better performance in office or employment and as well advance the economy of the locality which yields the tax revenues'" (quoting *Kennedy v. Newark*, 148, A.2d 473, 476 (N.J. 1959))).

[105] *Id.* at 21–22 (citing 266 A.2d at 614).

[106] 266 A.2d at 613.

[107] *Id.* at 614 (internal quotation marks omitted).

[108] *Id.* The City cites to additional decisions of other courts interpreting residency requirements that likewise concluded that "residency" means "domicile." *See supra* note 89. But only *Ferguson v. Board of Police Commissioners of Kansas City* discusses the policy purpose underlying the decision, and only *Hill v. City of Scranton* involved a collective bargaining agreement. *See Hill*, 411 F.3d at 118; *Vasquez*, 2010 WL 2364433; *In re Ball*, 896 N.Y.S.2d 489; *Ferguson*, 782 S.W.2d 814; *Fagiano*, 456 N.E.2d 27; *Choike*, 290 N.W.2d 58; *Rodgers*, 397 A.2d 1286. And neither of those decisions are instructive.

Even assuming that decisions from other jurisdictions can supply the "explicit, well-defined" Delaware policy necessary to vacate an arbitration award,[109] two countervailing policy considerations dominate.

The first countervailing policy consideration applies to disputes over collective bargaining agreements, which were not at issue in *Mercadante* nor the other authorities on which the City relies.[110] The first section of the Act contains an express policy statement that informs disputes over collective bargaining agreements adopted pursuant to the Act:

> It is the declared policy of the State and the purpose of this chapter to promote harmonious and cooperative relationships between public employers and their employees, employed as police officers and firefighters, and to protect the public by assuring the orderly and uninterrupted operations and functions of public safety services. These policies are best effectuated by . . . [o]bligating public employers and organizations of police officers and firefighters which have been certified as representing their employees to enter into collective bargaining negotiations with the willingness to resolve disputes relating to terms and conditions of employment

In *Ferguson*, the court identified the policy rationale underpinning Missouri's residency requirement (rather than that of the General Assembly, which the court must ascertain here). *See* 782 S.W.2d at 817. In *Hill*, the collective bargaining agreement at issue contained its own definition of "residence" that allegedly conflicted with a city ordinance. *See* 411 F.3d at 127–128. Those situations are factually inapposite to this litigation.

[109] *See Corr. Officers Ass'n of Del.*, 2016 WL 6819733, at *10 (quoting *AFSCME*, 2003 WL 1530503, at *4 (internal quotation marks omitted)).

[110] *See supra* note 108.

and to reduce to writing any agreements reached through such negotiations . . . .[111]

Tailored to the circumstances of this case, the policy of the Act is that collective bargaining over the terms and conditions of police officer's employment is the best way to effectuate harmonious relations between the City and its police officers. The City does not dispute that residency is a condition of employment generally subject to mandatory bargaining.[112] Thus, a relevant, explicit, and well-defined Delaware policy—that of the Act—directs that the court favor bargaining over the subject of residency.

The second countervailing policy consideration is that Delaware law supports "arbitration as a means of resolving labor disputes."[113] Delaware law favors arbitration because it is "an efficient means of resolving these disputes."[114] In fact, "the arbitral process is sometimes viewed as superior to the judicial process because of an arbitrator's greater knowledge and experience regarding the parties, and

---

[111] 19 *Del. C.* § 1601(2).

[112] In briefing, the City stated that "[i]n the absence of the requirement in the City's Charter enacted by the General Assembly, the City has consistently agreed *arguendo* that a requirement that Covered Employees reside in the City would be an appropriate bargaining subject, *i.e.* a condition of employment under [the Act]." Pl.'s Answering Br. at 15. This decision holds that no requirement in the City Charter removes the issue of residency from the subject of bargaining. Hence, the City concedes that residency is an appropriate bargaining subject.

[113] *See AFSCME*, 2014 WL 1813279, at *2.

[114] *See AFSCME*, 2003 WL 1530503, at *4 & n.22.

because he has been selected by them."[115]  Neither *Mercadante* nor the other authorities on which the City relies involved the interpretation of an arbitration award,[116] and thus these cases lack the persuasive value that the City ascribes to them.

The City therefore fails to persuade the court that the Arbitration Award is contrary to public policy.

### C.    The Arbitration Award Draws Its Essence from the Collective Bargaining Agreement.

An arbitration award "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice."[117]  To conclude that an arbitration award does not "draw its essence" from the collective bargaining agreement, the court "must be persuaded that the award is without rational support, cannot be rationally derived from the terms of the agreement, or bears no reasonable

---

[115] *Del. State College v. Del. State College Chapter of Am. Ass'n of Univ. Professors*, 1987 WL 25370, at *2 (Del. Ch. Nov. 24, 1987) (quoting *City of Wilmington v. Wilm. Firefighters Loc. 1590, Int'l Ass'n of Firefighters*, 385 A.2d 720, 724 (Del. 1978)).

[116] *See Mercadante*, 266 A.2d 211; *Hill*, 411 F.3d at 118; *Vasquez*, 2010 WL 2364433; *In re Ball*, 896 N.Y.S.2d 489;  *Ferguson*, 782 S.W.2d 814; *Fagiano*, 456 N.E.2d 27; *Choike*, 290 N.W.2d 58; *Rodgers*, 397 A.2d 1286.

[117] *City of Wilmington v. AFSCME, Council 81, Loc. 1102*, 2005 WL 820704, at *3 (Del. Ch. Apr. 4, 2005) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).  The FOP cites to a passage of *AFSCME* as controlling law regarding the power of an arbitrator.  *See* Def.'s Answering Br. at 22–23 (quoting *AFSCME*, 2005 WL 820704, at *3).  But in a significant portion of the passage which the FOP quotes, the court was quoting the language of the specific collective bargaining agreement at issue.  *See AFSCME*, 2005 WL 820704, at *3.  That is therefore not persuasive guidance in assessing collective bargaining agreements generally.

relationship to the underlying contract from which it is derived."[118]  The court cannot reach such a conclusion simply because "others might interpret the same provisions differently."[119]

To argue that the Arbitration Award does not draw its essence from the Agreement, the City again contends that "the Arbitration Award is based entirely on the Arbitrator's erroneous interpretation of the Charter Residency Requirement which is not part of the [Agreement]."[120]  As discussed above, contrary to the City's assertions, there is no express Delaware law interpreting the Residency Requirement to require the 2018 Definition, and the Arbitration Award thus did not err in reaching this conclusion.  Accordingly, the City's contractual argument fails to supply a reason to vacate the Arbitration Award.

The decision to which the City cites is factually inapposite.  In arguing that the Arbitration Award does not "draw its essence" from the Agreement, the City relies on *Interstate Brands Corp. v. Local 411 Retail, Wholesale and Department*

---

[118] *AFSCME*, 2005 WL 820704, at *3 (citing *Meades*, 2003 WL 939863, at *4); *accord. Corr. Officers Ass'n of Del.*, 2016 WL 6819733, at *8.

[119] *AFSCME*, 2005 WL 820704, at *3 (quoting *New Castle Cnty. v. Fraternal Ord. of Police*, 1996 WL 757237, at *3 (Del. Ch. Dec. 17, 1996)); *accord. State Dep't of Corr. v. Del. Public Empls. Council 82, AFCSME*, 1987 WL 5179, at *3 (Del. Ch. Jan. 7, 1987); *see also Del. State Univ. Chapter of Am. Ass'n of Univ. Professors v. Del. State Univ.*, 1995 WL 523585, at *1 (Del. Ch. Aug. 18, 1995) ("[T]he court does not review an arbitrator's decision for ordinary factual or legal error.").

[120] Pl.'s Answering Br. at 34.

*Store Union, AFL-CIO*, where the arbitration award made no reference to the collective bargaining agreement.[121] Here by contrast, the arbitrator cited to Section 5.1 of the Agreement, a provision that seeks to preserve the conditions of employment for covered employees.[122] He found that the 2018 Definition amounted to a unilateral and material change to a "condition of employment detrimental to the bargaining unit."[123] He therefore concluded that the revision violated Section 5.1 of the Agreement.[124] These aspects of the arbitrator's analysis reveal that the Arbitration Award did have rational support, was rationally derived from the terms of the Agreement, and bore a reasonable relationship to the Agreement, such that it drew its essence from the Agreement.

## III. CONCLUSION

For the foregoing reasons, the City's motion is DENIED, and the FOP's motion is GRANTED.

---

[121] *See* Pl.'s Opening Br. at 27–28 (citing 39 F.3d 1159, 1160–62 (11th Cir. 1994)).

[122] Arbitration Award at 8–9, 21 (citing Agreement § 5.1). The City concedes as much in its briefing. *See* Pl.'s Opening Br. at 17–18 ("[T]he Arbitration Award *relies upon §§ 5.1 and 20.1* of the [Agreement] in an attempt to adopt and incorporate into that agreement a less-stringent standard for residency limited to the specific language contained in prior forms of the Annual Residency and City policies." (emphasis added)).

[123] Arbitration Award at 22.

[124] *Id.*