**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1761
_____

LINDA ATIYEH; GETTYSBURG INVESTORS LLC; THE GETTYSBURG
MOOSE LLC; LINCOLN SQUARE LLC; GALLERY 30 LLC; THE UPPER
CRUST LLC; JAMILIE ABRAHAM LLC,
Appellants

v.

BOROUGH OF GETTYSBURG; THEODORE H. STREETER; SUSAN NAUGLE;
WESLEY K. HEYSER; PATRICIA A. LAWSON; JACOB SCHINDEL; CHRIS
BERGER; CHARLES STRAUSS; JOHN LAWVER; CHARLES R. GABLE;
RICHARD L. MILLER, II
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:19-cv-01412)
District Judge:  Honorable Karoline Mehalchick
_____

Argued: January 17, 2025
_____

Before:  PHIPPS, FREEMAN, and CHUNG, *Circuit Judges*

(Filed: March 17, 2025)
_____

Gerald E. Arth          [ARGUED]
FOX ROTHSCHILD
Two Commerce Square
2001 Market Street, Suite 1700
Philadelphia, PA 19103

Jocelyn Mendez
Danielle E. Ryan
FOX ROTHSCHILD
747 Constitution Drive, Suite 100
Exton, PA 19341

            *Counsel for Appellants*


Rolf E. Kroll          [ARGUED]
MARGOLIS EDELSTEIN
214 Senate Avenue
Suite 402
Camp Hill, PA 17011

            *Counsel for Appellee*

_____

OPINION[*]

_____


PHIPPS, *Circuit Judge*.

In this case, a local businessowner sued a borough under 42 U.S.C. § 1983 on the belief that the borough manager held a vendetta against her and induced the borough to revise its parking ordinance to her detriment. When discovery uncovered no evidence that the governing council had any retaliatory intent, the borough moved for summary judgment, and the District Court granted that motion. In this appeal, the businessowner disputes that ruling. On *de novo* review, we will affirm the judgment of the District Court

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

because there is no factual or legal support for attributing the borough manager's intent to the borough council.

## BACKGROUND

Between 2016 and 2019, Linda Atiyeh owned and operated several small businesses in the Historic District of the Borough of Gettysburg, Pennsylvania. One of those businesses was Gallery 30, an art gallery and retail store. She also opened a restaurant, The Upper Crust, in 2018, and worked during that time to open another restaurant, Jamilie.

### A. The Signage Dispute and the Alleged Formation of Retaliatory Animus

Through its sign ordinances, the Borough of Gettysburg, Pennsylvania requires a permit for every sign in the Borough and a certificate of appropriateness for every sign in the Borough's Historic District.[1] In November 2016, there were several objects hung along the western wall of Gallery 30, which abuts a pedestrian walkway, for which the Borough had not issued either a permit or a certificate of appropriateness. And on November 7, 2016, the Borough's Code Enforcement Officer sent Atiyeh a letter informing her that nine of those objects violated the sign ordinances. That letter provided a penalty-free ten-day period for Atiyeh to either remove the signs or obtain the proper approval.

Atiyeh did not remove those items within that time. Instead, one day before the grace period expired, she emailed the Code Enforcement Officer's supervisor – the

---

[1] *See* Gettysburg Borough Ordinance § 19-111(3) (explaining that a sign cannot be placed without a permit or without complying with any other requirements under the municipal code); *id.* § 19-121 (indicating that a sign in the Borough's Historic District must receive a certificate of appropriateness); *id.* (describing how, to receive a certificate of appropriateness, one must request approval from the Historic Architectural Review Board, which then makes a recommendation to the Borough Council, which makes the final decision); *see also id.* § 19-103 (defining 'sign' as "[a]ny structure, device or object that incorporates lettering, logos, colors, lights, or illuminated inert gas tubes visible to the public from a building or structure, which either conveys a message to the public, or intends to advertise, direct, invite, announce, or draw attention to goods, products, services, activities, or facilities, excluding window displays of merchandise or noncommercial items").

Borough Manager, Charles Gable. In that communication, Atiyeh asserted that the sign-permit ordinances did not apply to the nine items on the western wall of Gallery 30 because those objects were art, not signs.

After the grace period expired, the Borough made a site visit and discovered not only that the nine items remained on the western wall of Gallery 30 but also that Gallery 30 was in violation of other borough ordinances. Shortly afterward, the Borough's Chief Code Official, who was supervised by Gable, issued a Notice of Violation, which was served on Atiyeh at her home. That Notice explained that the nine signs violated the Borough's sign ordinances because they lacked the requisite permits and certificates of appropriateness. The Notice further informed Atiyeh of the potential fines – up to $600 per violation. It also provided warnings with respect to the other discoveries from the site visit: two additional violations of the sign ordinances, and a violation of another ordinance for merchandise blocking the sidewalk. The Notice informed Atiyeh that the sidewalk violation was punishable by a fine of up to $1,000 and imprisonment for up to ninety days for each day of noncompliance.

After receiving that Notice, Atiyeh began calling members of the Borough Council, the Borough's seven-person legislative body.[2] Some of their staff called Gable to express their support for Atiyeh.

Gable was not receptive to those concerns. Through an email sent to all Councilmembers, as well as to other employees of the Borough, he opined that it was inappropriate for people supporting Atiyeh to call him on Atiyeh's behalf. He also made

---

[2] At the time, the Council consisted of President Robert Kummerich, Vice President Scot Pitzer, AmyBeth Hodges, Wesley Heyser, Susan Naugle, Jacob Schindel, and Graham Weaver.

4

clear that he was not sympathetic to Atiyeh's position because she was in violation of multiple Borough ordinances and was unwilling to come into compliance.[3]

Not all recipients of Gable's email agreed with his approach. Councilmember Susan Naugle later wrote to Gable that Atiyeh "perceive[d the Notice of Violation letter] as 'insulting'" and that "many on Council felt that the Notice of Violation letter was not acceptable." E-mail from Naugle to Gable and Rebecca LaBarre (Nov. 30, 2016, 11:24 a.m.) (App. 95).

In addition to pursuing a legislative solution, Atiyeh filed an administrative appeal of the sign violations with the Borough's Zoning Hearing Board. She no longer relied on the art-not-signs argument; instead, she asserted that a permit was not required for the signs because the western wall of Gallery 30 abutted an 'alley,' not a 'street.' That approach succeeded, and the Zoning Hearing Board resolved the appeal in her favor on February 13, 2017. Afterward, Atiyeh applied for the certificates of appropriateness needed to hang those signs in the Borough's Historic District, and the Borough Council issued those certificates.

Gable appeared displeased with this resolution. According to Councilmember AmyBeth Hodges, he told the Council that the Borough "has to stop [Atiyeh]" and that he was "going to get her back." Hodges Aff. (App. 303–04).

---

[3] Over time, Gable's sentiment became more widely known: in covering the signage dispute, a local op-ed writer described Gable as "harass[ing] and intimidat[ing]" Atiyeh. Harry Hartman, *Signs of Government Being Anti-Business*, Gettysburg Times, Jan. 25, 2017, at 4 (App. 302).

5

**B. The Dispute over Meter Bagging and the Claimed Effectuation of Gable's Alleged Retaliatory Animus Through an Amended Parking Ordinance**

About one year later, in early 2018, Atiyeh opened The Upper Crust in downtown Gettysburg. Her business model for that restaurant centered around convenience – customers could order takeout or eat a quick meal on the premises.

Although the streets near that restaurant had metered parking, the Borough had long permitted meter bagging. Under that practice, qualified approved applicants could reserve metered parking spaces by placing a bag over the meter for the cost of $1 per hour or $100 a month. *See* Gettysburg Borough Ordinance § 15-712 (2018). The Borough allowed meter bagging as a means of reserving parking for parties of tourists; visiting business, civil, and governmental groups; funeral and church-event attendees; construction crews; and special loading and unloading purposes. *See id.* § 15-711 (2018). In practice, at the time when The Upper Crust opened, bagging generally occurred on an event-by-event basis, and the only businesses using meter bagging to reserve parking spaces on a long-term basis were hotels and bed and breakfasts – for guest loading and unloading.

That changed on April 22, 2018, when Atiyeh applied to permanently reserve six parking spots: three in front of the restaurant and three in front of Gallery 30. The Borough Parking Manager, Richard Miller – who reported directly to Gable – granted that application in full.

It did not take long before the Borough began receiving complaints. On May 4, the owners of the nearby Brafferton Inn emailed Borough Manager Gable to question why a retail store was allowed to reserve parking spaces. They expressed concern that Atiyeh's conduct would "set[] a dangerous precedent in which any business can buy parking spots," which would make it harder for residents and tourists to find spots where they could park to walk around town or visit multiple businesses. E-mail from Brafferton Inn to Gable

6

(May 4, 2018, 2:08 p.m.) (App. 559). On May 9, a Borough resident emailed Parking Manager Miller to point out that "[m]uch discussion has ensued among friends and fellow Gettysburgians" about why Atiyeh was allowed to reserve parking spaces in front of Gallery 30. E-mail from Lisa Shower to Richard Miller (May 9, 2018, 7:53 p.m.) (D.C. ECF No. 58-2 at 151). That resident further shared the concern that if Atiyeh continued to buy up property and reserve parking spaces downtown, there might not be enough spaces left for customers of other businesses. Other residents presented similar concerns to Miller – they were worried that Atiyeh was "taking up vital spaces on main streets." Miller Dep. 35:6–14 (App. 600). The Borough Council – whose composition changed such that only three of the seven members had served when Atiyeh challenged the sign ordinance[4] – also received similar complaints.

In responding on May 5 to the email from the owners of the Brafferton Inn, Gable shared several pieces of information. After assuring the owners that he and the Council were "aware of this issue," Gable confirmed that the Parking Ordinance was intended to allow only hotels and bed and breakfasts to reserve spaces so that their guests could quickly park while checking in, checking out, and loading and unloading luggage – not to allow restaurants and retail establishments to reserve parking spaces for customers. E-mail from Charles Gable to Brafferton Inn (May 5, 2018, 1:20 p.m.) (App. 558). But, he explained, the "definition of 'loading and unloading' in [the Parking Ordinance did] not narrowly define it this way," and Atiyeh was litigious: she had been able to convince the Zoning Hearing Board to "interpret[] the private walkway between [Gallery 30] and the [building next door] to be an alley," contrary to the text of the Motor Vehicle Code, in part through

---

[4] At that time, the Councilmembers were President Susan Naugle, Vice President Jacob Schindel, Christopher Berger, Wesley Heyser, Patricia Lawson, John Lawver, and Charles Strauss.

7

"VERY strong political pressure from her friends and supporters." *Id.* (App. 558–59). Thus, according to Gable, "the Borough and its staff [did] not have the capacity (financially or politically) to enforce [the Parking Ordinance] in the manner in which [it] . . . was intended when it was adopted years ago," and "[s]o, for now, to avoid another public outcry and costly legal battle," it had granted Atiyeh's request and would grant any other meter-bagging requests it received. *Id.* (App. 559). But, Gable explained, the Borough's ultimate plan – to be effectuated by the Council, which had the final authority to decide how to proceed in the matter – was to amend the Parking Ordinance to clarify the narrow definition of 'loading and unloading.'

Consistent with Gable's email, on June 21, Parking Manager Miller provided the Council with a policy briefing that encouraged it to revise the Ordinance. That briefing explained that the meter-bagging provision in the Parking Ordinance was "not designed to allow businesses or residents to have a permanent, reserved parking space on a public street to utilize at their behest." Miller, *Policy Briefing Summary: Chapter 15 Parking Revisions* 1 (2018) (App. 561). But Atiyeh's meter bagging did just that, so the policy briefing recommended that the Council "close the loophole" by clarifying that the Parking Ordinance did not allow businesses to reserve spaces for long-term customer parking – that 'special unloading and loading purposes' should take no more than fifteen minutes. *Id.* at 1–3 (App. 561–63).

In the meantime, the Borough received additional applications to permanently reserve metered parking spaces. It granted applications for at least three other business. And in August 2018, it granted Atiyeh's application to permanently reserve three metered parking spaces for Jamilie, a new restaurant she was trying to open.

8

That same month, Atiyeh requested a restaurant liquor license for The Upper Crust, and the Council approved it. *See* Council Resolution No. 040918 (Aug. 13, 2018);[5] *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (explaining that the Court may take judicial notice of "information [that] is publicly available on government websites").

On April 8, 2019, after considering amending the Parking Ordinance for ten months, the Council amended the Parking Ordinance to allow only two types of businesses to reserve parking spaces on a non-temporary basis: hotels and bed and breakfasts. *See* Gettysburg Borough Ordinance § 15-711(2)–(3) (2019). According to affidavits later filed by the Councilmembers, the signage dispute "played no role whatsoever" in their decision to amend the Ordinance. Councilmembers' Affs. (D.C. ECF No. 52-7). Rather, in reaching the unanimous decision to amend the Parking Ordinance, the Council explained that the issue of meter bagging had not been "the subject of . . . review and update" since the 1980s, Statement of Purpose & Legislative Intent (App. 567), and it acknowledged that "the safe and convenient accommodation of overnight guests in the Borough by hotels and bed and breakfast use establishments provides a potential economic opportunity and benefit for other commercial uses in the Borough," *id.* (App. 568). Ultimately, it was the comparison between the interests of lodging establishments and those of other commercial business that motivated the Council to allow only lodging establishments to permanently meter bag:

> [L]imiting the reservation of public parking spaces by hotels and bed and breakfast use establishments, as opposed to authorizing such reservation and use of public parking to much more prolific commercial uses in the downtown area of the Borough and along its primary public streets such as retail stores and shops, restaurants and professional and business offices, will not unreasonably or severely limit or eliminate safe and convenient on-street parking.

---

[5] *Available at* https://www.gettysburgpa.gov/sites/g/files/vyhlif3156/f/pages/040918_liquor_license_transfer_to_upper_crust.pdf [https://perma.cc/MD87-LBDR].

*Id.* (App. 568).   Under the revised Parking Ordinance, none of the non-lodging establishments that had been granted meter bags, including Atiyeh's three businesses, were allowed to continue bagging parking meters.

After the Council amended the Parking Ordinance, Gable made statements indicating that he did not forget about the prior signage dispute with Atiyeh.  He told Councilmembers to "take to task" the Zoning Hearing Board members who voted in favor of her appeal.  *See* Text Message from Gable to Chris Berger, Charles Strauss, Jake Schindel, and John Lawver (Aug. 16, 2019, 6:31 p.m.) (App. 317).  And when he later learned that one of Atiyeh's businesses would be protested, he texted four separate people that "karma is a bitch."  Text Message from Gable to Alex Hayes (July 1, 2019, 12:20 p.m.) (App. 318–22); Text Message from Gable to Chad Clabaugh (July 1, 2019) (App. 332); *see* Text Message from Gable to Deb Adamik (11:05 am) (App. 328–30); Text Message from Gable to Rebecca LaBarre (July 1, 2019, 2:48 p.m.) (App. 326).  In addition, he reached out to the protest's organizer to offer his support.  *See* Facebook Message from Gable to Olivia (11:48 p.m.) (App. 331).

## PROCEDURAL HISTORY

On August 14, 2019, Atiyeh along with six of her businesses invoked the subject matter jurisdiction of the District Court, *see* 28 U.S.C. § 1331, to initiate this civil rights suit under 42 U.S.C. § 1983 against the Borough, all Councilmembers at the time of the parking dispute, and several Borough officials, including Gable, in their individual capacities. *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) ("Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and

10

promulgated by that body's officers."). After Atiyeh agreed with the individual defendants to dismiss without prejudice the claims against them,[6] all that remained was a First Amendment retaliation claim against the Borough: she alleged that the Council amended the Parking Ordinance in retribution for her success in the Gallery 30 signage dispute. Following the close of discovery, the Borough successfully moved for summary judgment on that claim. *See Atiyeh v. Borough of Gettysburg*, 2024 WL 1286216 (M.D. Pa. Mar. 26, 2014). Through a timely notice of appeal, Atiyeh invoked this Court's appellate jurisdiction, *see* 28 U.S.C. § 1291, to challenge that final decision.

## DISCUSSION

A *prima facie* claim for unconstitutional retaliation consists of three elements. A plaintiff must establish "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). Here, the parties dispute only the third element, a causal link. While such a causal link may be established through "evidence gleaned from the record as a whole," *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016), precedent also recognizes two indirect methods for satisfying that element of the *prima facie* showing for purposes of pretrial motions: "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action . . . [or] a

---

[6] Atiyeh brought retaliation, equal protection, substantive due process, and promissory estoppel claims against the Mayor, the Councilmembers, Gable, and Miller. The dismissal without prejudice of these claims is not a bar to this Court's appellate jurisdiction: such a dismissal is considered final for purposes of § 1291 if the claim's statute of limitations has run, *see Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 460 F.3d 470, 477 (3d Cir. 2006) – which it has, *see Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017) (noting the statute of limitations for § 1983 actions in Pennsylvania is two years).

pattern of antagonism coupled with timing," *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). If a plaintiff has demonstrated a *prima facie* case of retaliation, then to prevail in a pretrial dispositive motion, the defendant must show that it "would have reached the same decision even in the absence of the protected conduct." *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). And to meet that standard at summary judgment, "the defendant must present evidence of such quality that no reasonable juror could conclude that the protected activity was the but-for cause of the [complained-of action]." *Hill v. City of Scranton*, 411 F.3d 118, 126 n.11 (3d Cir. 2005).

For the reasons below, even assuming *arguendo* that Atiyeh has established a *prima facie* case of retaliation, the Borough has produced sufficient evidence such that no reasonable juror could conclude that her conduct during the signage dispute was the but-for cause of the revised Parking Ordinance. *See id. See generally* Fed. R. Civ. P. 56(a); *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) (explaining that "summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law'" (quoting Fed. R. Civ. P. 56(a))); *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019) (recognizing that this Court "may affirm on any basis supported by the record, even if it departs from the District Court's rationale").

Based on the undisputed facts in the record, several features of the Borough Council's decision to revise the Parking Ordinance demonstrate that it was not motivated by an interest in retaliating against Atiyeh for the Gallery 30 signage dispute.

First, the undisputed facts in the record reveal that the immediate impetus for the Council's amendment to the Parking Ordinance was the bevy of complaints that the

12

Borough received about Atiyeh's permanently meter bagging six parking spots. There is no evidence that any Councilmember – or even Gable – contemplated amending the Parking Ordinance before the Borough began receiving complaints.

Second, after the signage dispute, the Borough took actions that benefitted Atiyeh. Two months after the Zoning Hearing Board's decision, the Council granted certificates of appropriateness for the signs at Gallery 30. And in August of 2018, in the midst of the parking meter dispute, the Council granted Atiyeh a restaurant liquor license for The Upper Crust. *See* Council Resolution No. 040918 (Aug. 13, 2018).

Third, the Borough Council voted unanimously to amend the Parking Ordinance. As far as timing, that vote occurred after ten months of the Council studying the issue and considering alternative solutions, which is consistent with the Council making an informed, independent decision – not reflexively acting on animus. The numbers are also telling: only three of the seven Councilmembers had their seats during the Gallery 30 signage dispute. So even if those three members acted with retaliatory animus, they did not by themselves hold enough votes to amend the Parking Ordinance.

Atiyeh's countertheory of causation consists of two parts. First, she attempts to prove that Borough Manager Gable held a retaliatory animus toward her. Second, because Gable was not a Councilmember, Atiyeh seeks to impute his alleged animus to the Council through a cat's paw approach: she claims that Gable manipulated the Council to effectuate his desired retaliation. *See generally Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011) (explaining that in a "cat's paw case," the plaintiff seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision" (internal quotation marks and citations omitted)); *Crosbie v. Highmark, Inc.*,

13

47 F.4th 140, 145 (3d Cir. 2022) (explaining that the cat's paw theory applies when "some nefarious manager . . . use[s] [HR] as an instrument of retaliation").

The problem for Atiyeh is the second part of her countertheory – the cat's paw approach.

As a factual matter, she comes up short. Although Gable spoke out against Atiyeh to Councilmembers, there is no evidence that any member agreed with or was otherwise influenced by those statements. *See Crosbie*, 47 F.4th at 146 (finding that the cat's paw theory failed because there was no evidence the individual alleged to have retaliatory intent influenced the plaintiff's firing). To the contrary, they each signed an affidavit averring that the signage dispute "played no role whatsoever" in their decision to amend the Ordinance. Councilmembers' Affs. (D.C. ECF No. 52-7). And they repeatedly voted to grant other requests made by Atiyeh after she prevailed in the signage dispute – the three certificates of appropriateness for the signs for Gallery 30 as well as the liquor license for The Upper Crust.

Also, as a matter of law, the cat's paw theory has been applied to *employment discrimination* claims. *See Staub*, 562 U.S. at 415; *Crosbie*, 47 F.4th at 145. Atiyeh identifies no case applying the theory to *legislation*. Indeed, extension of such a theory to legislative bodies is inconsistent with several foundational legal principles. Legislatures, unlike employers, have an independent "duty to exercise their judgment and to represent their constituents." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). And because there are countless possible justifications for legislation, the improper motives of a single legislator cannot be attributed to the entire legislature. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged

14

illicit legislative motive."); *McCray v. United States*, 195 U.S. 27, 56 (1904) ("The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."); *cf. Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475–76 (1977) (explaining that in the bill of attainder context, a law is permissible so long as it "reasonably can be said to further nonpunitive legislative purposes"). If a single legislator's improper motives cannot taint the entire legislative body, then, on this record, in which all Councilmembers produced affidavits averring that the signage dispute "played no role whatsoever" in their decision to amend the Parking Ordinance, no reasonable juror could conclude that Gable's motives infected the entire Council. Councilmembers' Affs. (D.C. ECF No. 52-7); *cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534–35 (1993) (concluding that facially neutral municipal ordinances were discriminatory because, based on the record, "[t]here [could] be no serious claim that [non-discriminatory] interests justify the ordinances").[7]

### CONCLUSION

For these reasons, we will affirm the judgment of the District Court.

---

[7] Judge Freeman would permit Atiyeh's First Amendment retaliation claim to proceed to trial. In her view, a reasonable jury could find that Gable's retaliatory animus tainted the Council's decision to amend the Parking Ordinance. *See Staub*, 562 U.S. at 419–20; *Suppan*, 203 F.3d at 237–38 (concluding that the lack of retaliatory animus by the ultimate decisionmaker "cannot expunge the taint" of retaliation earlier in the decision-making process). Although Gable is not a voting member of the Council, as Borough Manager his "job [wa]s to recommend" actions to the Councilmembers. App. 264. One such recommendation was to amend the Parking Ordinance. He made that recommendation because Atiyeh began "bagging" the meters in front of her businesses and because he feared that Atiyeh would prevail in a legal challenge, as she did with the signage dispute. Although Gable supported his recommendation with a policy briefing, that briefing was prepared by one of his direct reports, and, in Judge Freeman's view, a reasonable jury could find the basis for the briefing's recommendation was pretextual.

15